**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Patrick HINTON, Defendant–Appellant.**

**No. 93–10323.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 9, 1994.

Decided July 28, 1994.

---

**5.** Appellant's pending motions are denied as    moot.

Javier Chon–Lopez, Asst. Federal Public Defender, Tucson, AZ, for defendant-appellant.

Virginia C. Kelly, Asst. U.S. Atty., Tucson, AZ, for plaintiff-appellee.

Before: WALLACE, CHOY, Circuit Judges, and McGOVERN, District Judge.*

Opinion by Judge CHOY.

CHOY, Circuit Judge:

On January 22, 1993, Appellant Patrick Hinton was convicted of one count of assault with intent to murder under 18 U.S.C. § 113(a). He was sentenced to 121 months imprisonment and three years supervised release. Hinton brings this appeal to challenge four aspects of his conviction and one aspect of his sentence. We affirm.

## BACKGROUND

Hinton's conviction stems from an attack on his wife, Irma Hinton, also an Apache Indian, near their home on the San Carlos Indian Reservation in Arizona on August 19, 1992. The parties agree that the incident took place after the victim drove Hinton to the Point of Pines junction. From there Hinton intended to hitchhike back to the ranch where he worked after staying home three weeks to take care of their three children, who were also in the car. Beyond this, the facts surrounding the attack are largely in dispute.

Hinton testified that the couple began arguing as they arrived at the highway junction. This argument allegedly concerned Irma's practice of leaving the children alone while going out drinking during Hinton's extended work stints at the ranch. According to Hinton's version, the argument angered him and led him to kick her. To scare her, he then took out his pocket knife and stabbed "straight ahead". Hinton admitted that he knew he had cut Irma, but claimed he did not realize he had stabbed her through the hand and forearm or that she needed medical attention. Hinton testified that he then put away his knife and began dragging Irma around because she refused to drive him to nearby Triplett Mountain. According to Hinton, he began driving the car in that direction, whereupon Irma caused the car to

---

* The Hon. Walter T. McGovern, Senior District Judge, Western District of Washington, sitting by designation.

swerve in front of an oncoming truck. After failing to restart the car, Hinton walked away from his family in anger.

Irma testified that the incident began with Hinton kicking her in the neck without warning after telling her to stay home and be a good wife and mother. According to Irma's version, he then dragged her by the hair, knocked her to the ground and kicked her in the forehead. Hinton then took out his folding knife and said that he was going to kill her as he had long wanted to do. Hinton lunged toward her neck with the knife, but Irma blocked the blow with her hand. The force of the blow caused the knife to pass out the other side of her palm. Irma then deflected the second blow, whereupon the knife passed through her left forearm. Irma testified that after Hinton pushed her and pulled her by the hair, he relented in response to the children's pleas that he stop. Hinton then pulled his knife out of her arm and demanded that Irma take him to Triplett Mountain. Irma refused for fear that Hinton would hurt her further and begged Hinton in vain to take her to the hospital. Ignoring her pleas, Hinton then took the wheel and began driving toward Point of Pines and away from the nearest hospital.

Irma testified that she then grabbed the steering wheel to force the car to swerve toward an oncoming truck. After she ran toward the driver for help, Hinton yelled that "I didn't hurt her, there is nothing wrong." Hinton then put his hand over her mouth to prevent her from yelling as the truck driver drove off. Next Irma tried unsuccessfully to get a woman standing nearby, Madeline Stevens, to take her to the hospital. Ms. Stevens declined because she said her car was parked too far away. Ms. Stevens testified that blood covered the victim's arms and blouse, and that a pool of blood had formed on the ground. After Hinton walked away, Irma drove herself and the children toward the hospital until she found a policeman, Officer Terrazas, to call her an ambulance.

At trial Officer Terrazas testified that Irma's hands were bleeding from both sides and that her arms were "all covered with blood." Leon Thompson, a medical technician sent to the scene of the attack, further

testified that blood covered the victim and the interior of the car. After being administered oxygen, Irma remained conscious throughout the trip to the hospital, was treated there and released the same day or the following morning.

Before and during trial, Hinton moved to bar admission of bad acts evidence under Rules 403 and 404(b) of the Federal Rules of Evidence. Hinton objected to the detail and scope of the prior bad acts evidence. The district court denied these motions and overruled Hinton's objections. Accordingly, testimony was admitted concerning Hinton's numerous alleged assaults on Irma, including: (i) an attack with a rock around May 1983, approximately four months into the Hintons' marriage, which scarred Irma's head and finger; (ii) an attack in July 1983 that left Irma with a collapsed lung and lacerated finger resulting from blows with a rock and from Hinton's knife and feet. During that attack Hinton held Irma's head underwater until she nearly blacked out and threatened to push her off a nearby cliff and burn her. Irma was hospitalized for seven days following the attack; (iii) Hinton's threat to harm Irma with his pocket knife in the early months of 1984; (iv) Hinton's threats to Irma with a knife in May 1990, which she reported to tribal authorities; and (v) Hinton's similar conduct in November 1990.

The district court did not permit Hinton to present the testimony of two witnesses, Brenda Kenton and Hardt Hooke. Hinton sought to have his neighbor, Ms. Kenton, testify that Irma sometimes went out drinking while leaving her children unattended. Ms. Hooke was to testify that she saw Irma holding a quart of beer in her supposedly seriously injured hand at a dance held only four days after the assault underlying the conviction at issue. Before defense counsel's closing argument, the district court *sua sponte* gave the jury the following definition of murder: "To commit the offense of murder, someone must kill with malice aforethought. To kill with malice aforethought means to kill deliberately and intentionally or recklessly, with extreme disregard for human life."

The presentence report assigned Hinton a category I criminal history and an offense level of 26, and recommended a 2–level increase for serious bodily injury. These recommendations corresponded to a guideline range of 63–78 months. The Government sought a 4–level enhancement for infliction of life-threatening or permanent injuries. The district court followed the Government's recommendation and found Hinton to be a level 30 offender with a category I criminal history. Judge Roll then sentenced the defendant to the top of the corresponding guideline range of 97–121 months.

## DISCUSSION

### I.

Hinton's first contention of error is that the district court committed reversible error by giving the jury a definition of murder permitting conviction based on mere reckless conduct rather than specific intent to murder. We disagree.

Where defense counsel fails to object to the jury instructions at trial, we review such instructions for plain error. *See United States v. Taren–Palma,* 997 F.2d 525, 531 (9th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1648, 128 L.Ed.2d 368 (1994). "Plain error is 'highly prejudicial error affecting substantial rights[,] and is found only in exceptional circumstances.'" *United States v. Varela,* 993 F.2d 686, 688 (9th Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 232, 126 L.Ed.2d 186 (1993), *quoting United States v. Harris,* 738 F.2d 1068, 1072 (9th Cir.1984). Hinton asserts that he objected to the district court's decision to give the jury a definition of murder and that the correct standard is therefore abuse of discretion. However, the record indicates that Hinton's objection was conditional and was waived upon defense counsel's indication that he accepted the court's proposed definition of murder. Accordingly, the plain error standard applies.

Our decision in *United States v. Jones,* 681 F.2d 610 (9th Cir.1982), commends close scrutiny of Hinton's first contention. In *Jones* we found in analogous circumstances that the trial court committed reversible error in instructing the jury on

malice aforethought where the charged offense was assault with intent to commit murder. We found that:

> [w]hile this definition [of malice aforethought] would have been correct as part of an intent instruction if the charge had been murder, the intent to act in wanton disregard of the consequences to human life is less than the specific intent to kill necessary for a conviction of assault with intent to murder.

*Id.* at 611. Hinton argues that here, as in *Jones,* the district court's murder instruction and definition of malice aforethought permitted the jury mistakenly to infer that the intent to commit an act of extreme recklessness could serve as a proxy for specific intent to kill under 18 U.S.C. § 113(a). *Id.* at 611.

The Government counters that three other instructions delivered by Judge Roll clarified the specific intent requirement, cured any such error and distinguished the instant case from *Jones.* In doing so, the Government correctly points out that we must determine "'whether the jury instructions *as a whole* are misleading or inadequate to guide the jury's deliberations.'" *Varela,* 993 F.2d at 688, *quoting United States v. Joetzki,* 952 F.2d 1090, 1095 (9th Cir.1991) (emphasis in original). But we find no basis for its preferred distinction of *Jones.* On the contrary, it appears that in *Jones,* as here, the district court separately instructed the jury on the specific intent requirement. *Jones,* 681 F.2d at 612 (Goodwin, J., dissenting) ("[t]he trial court specifically and repeatedly told the jury that to convict, it must find that Jones assaulted Wingard with intent to murder").

Nevertheless, *Jones* is not a direct precedent because there is no indication that we applied the plain error standard of review in that case. Applying this deferential standard of review to the instant case, we do not find sufficient evidence in the record that the murder instruction was error, much less highly prejudicial error, warranting reversal and a retrial.

Here the jury evidently did not misapprehend the specific intent requirement. The crux of Hinton's argument is that the jury

may have believed his claim that he accidentally stabbed the victim, but nevertheless convicted him because they concluded that in failing to take her to the hospital, he acted "recklessly, in extreme disregard for human life," for purposes of the district court's murder instruction. But the jury's question to the judge concerning whether specific intent could be formed "in a short duration of time—one second", evidenced an insightful attempt to distinguish intent, an element of the charged offense, from premeditation. Viewing this question in conjunction with the three clarifying instructions on specific intent, we conclude that the district court did not commit plain error in instructing the jury on murder.

## II.

Hinton's second contention of error is that the district court committed reversible error in rejecting his motion *in limine* to bar evidence of four previous assaults on the victim occurring between May 1983 and November 1990. Defense counsel objected at trial that admission of this evidence was improper under Federal Rule of Evidence 404(b). We disagree.

We review for abuse of discretion a district court's decision to admit evidence of prior bad conduct under Rule 404(b). *United States v. Arambula–Ruiz*, 987 F.2d 599, 602 (9th Cir.1993). The district court denied Hinton's motion on the basis that the prior acts evidence was relevant to Hinton's "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" under Rule 404(b). Judge Roll instructed the jury three times that it could consider the prior acts evidence only for these purposes.

The district court correctly ruled that the testimony regarding Hinton's previous assaults on the victim satisfied the criteria for admission under Rule 404(b). To be admissible under Rule 404(b), evidence of prior acts and crimes must: (i) prove a material element of the crime currently charged; (ii) show similarity between the past and charged conduct; (iii) be based on sufficient evidence; and (iv) not be too remote in time. *Arambula–Ruiz*, 987 F.2d at 602.

Here all four criteria are satisfied. Intent is plainly an element of assault with intent to commit murder under 18 U.S.C. § 113(a). *Jones*, 681 F.2d at 611. Hinton's defense at trial was that he did not intend to stab the victim, but only to frighten her. Provided that the other three requirements for admissibility under Rule 404(b) are met, evidence of a prior incident involving the same victim has "probative value in disproving claims that the defendant lacked intent." *United States v. Lewis*, 837 F.2d 415, 419 (9th Cir.), *cert. denied*, 488 U.S. 923, 109 S.Ct. 304, 102 L.Ed.2d 323 (1988).

Dictum cited by Hinton in *United States v. Bettencourt*, 614 F.2d 214 (9th Cir.1980) does not dictate suppression of the prior acts evidence here. In *Bettencourt* we instructed that "[a] showing of intent to assault on an earlier occasion proves little, if anything, about an intent to assault at some later time." *Id.* at 217, *citing United States v. San Martin*, 505 F.2d 918 (5th Cir.1974) (distinguishing between prior crimes involving "deliberately and carefully premeditated intent" and those involving a "quickly and spontaneously formed intent—such as assault", less readily transferrable between separate events). We deem this limitation inapplicable where, as here and in *Lewis*— and in contrast to *Bettencourt* and *San Martin*—the charged and prior conduct were part of a pattern of abuse involving the same victim and, as discussed below, similar *modus operandi*. In such instances, the assault may be the culmination of a long-entertained plan or desire belying an accident defense, a circumstance borne out here by Hinton's contemporaneous statement during the charged assault that it was time to fulfill his wish to kill the victim.

As to the second prong, similarity, Hinton asserts that the instant assault charge is distinguishable from the prior bad acts, insofar as it occurred in the presence of the Hinton's children and outside the context of an argument. Even assuming their accuracy, these tangential distinctions are meaningless relative to the more essential identity remaining between the victim, the assailant,

the manner of the assault and the nature of the harm involved in the present and prior acts. *See United States v. Hadley,* 918 F.2d 848, 851 (9th Cir.1990) (approving use of evidence that in prior acts defendant performed similar acts of sexual gratification on victims).

■■■ As to the third prong, sufficiency of the proof, Hinton objects that "[t]he only evidence that the prior acts occurred at all was the testimony of Irma Hinton." However, we are not persuaded that where a witness testifies as to the defendant's prior bad acts, the jury must be presented with evidence corroborating the witness' testimony to satisfy the "low threshold required by [this] part ... of the test." *United States v. Houser,* 929 F.2d 1369, 1373 (9th Cir.1990). Under Rule 404(b), sufficient evidence of the prior bad acts must be presented "for a jury 'reasonably to conclude that the act[s] occurred and that the defendant was the actor.'" *Hadley,* 918 F.2d at 851, *quoting Huddleston v. United States,* 485 U.S. 681, 689, 108 S.Ct. 1496, 1501, 99 L.Ed.2d 771 (1988). In *Hadley,* the testimony of previous victims was sufficient to meet this portion of the test and establish that allegations of prior sexual abuse were more than the "unsubstantiated innuendo" of the sort disapproved of by the Court in *Huddleston.*[1] *Hadley,* 918 F.2d at 851. Accordingly, we deem the third element of the test satisfied.

■■■ With regard to the fourth prong, proximity in time, Hinton argues that "[b]ecause all of the prior assaults in the instant case were over two years old, they were too remote to be admissible under Rule 404(b)." This argument overlooks our express unwillingness to establish an "inflexible rule for remoteness in the context of Rule 404(b)." *Hadley,* 918 F.2d at 851. In *Hadley* the defendant had been charged with aggravated sexual abuse in connection with an incident occurring in late 1987 and early 1988. A witness testified to being subject to "regular pattern" of similar molestation by the defendant over a ten-year period ending in 1977. *Id.* Notwithstanding the ten-year hiatus be-

tween the charged and most recent prior conduct, we found that "[t]he similarity of the prior act to the offense charged outweighs concerns regarding remoteness." *Id.*

Here, the most recent act as to which testimony was presented preceded the charged conduct by the comparatively short period of two years. As to the remaining incidents, as in *Hadley* the jury had before it evidence permitting the conclusion that these acts comprised a "regular pattern" of abuse. We conclude that the earlier episodes in this pattern of abuse, linked to the charged assault by a chain of similar conduct, do not face the same temporal limitations as a similarly remote discrete act would encounter under Rule 404(b) analysis. Accordingly, we deem the four criteria for admissibility satisfied.

■■■ Hinton further argues that even if Rule 404(b) is thus satisfied, Rule 403 precludes admission of the predominantly prejudicial bad acts evidence. We disagree. We have consistently rejected similar arguments where, as here, the evidence was probative of intent and the district court properly instructed the jury as to the limited purpose for which the evidence was being admitted. *See Hadley,* 918 F.2d at 852 ("[t]he evidence was obviously prejudicial, but its prejudicial effect was limited by the instruction given by the district court"); *Arambula–Ruiz,* 987 F.2d at 604; *Houser,* 929 F.2d at 1373.

In addition, Irma's testimony was not plainly more inflammatory than the prior act testimony we deemed admissible in *Hadley,* 918 F.2d at 850 (sexual molestation of minors) or *Lewis,* 837 F.2d at 418 (child-beating). Similarly, although the victim's account of Hinton's contemporary threat to kill her during the charged assault could perhaps have established intent alone, the four previous incidents were no more duplicative than the bulk of the testimony we deemed to pass muster in *Hadley.* Accordingly, we find that the district court did not abuse its discretion in admitting the prior acts evidence.

1. Although a psychiatrist offered expert testimony in support of the childrens' accounts of being similarly victimized in *Hadley,* we emphasized that this testimony was admitted to explain and not to corroborate their accounts. 918 F.2d at 852–53.

## III.

Hinton's third contention of error is that the district court deprived him of his due process right to present a complete defense in (i) preventing Brenda Kenton from testifying as to the victim's drinking and parental practices and (ii) barring the testimony of Hardt Hooke as to the victim's ability to hold a quart of beer in her hand at a dance four days after the assault. We disagree.

■ We review for abuse of discretion a district court's refusal to admit evidence on the basis of factual determinations. *United States v. Mullins*, 992 F.2d 1472, 1475–76 (9th Cir.), *cert. denied*, — U.S. —, 114 S.Ct. 556, 126 L.Ed.2d 457 (1993).

As to Mr. Hooke's proposed testimony, the district court took the matter under advisement rather than grant that portion of the Government's motion in limine. When this witness was eventually called, defense counsel did not examine him. Hinton's appeal on this ground is therefore baseless.

■ The district court's ruling granting the Government's motion as to Ms. Kenton was correct because the precluded testimony lacked any permissible impeachment purpose. Under Federal Rule of Evidence 608(b), " '[s]pecific instances of the conduct of a witness, for the purpose of attacking the witness' credibility . . . may not be proved by extrinsic evidence.' " *United States v. Brooke*, 4 F.3d 1480, 1484 (9th Cir.1993). Ms. Kenton's precluded testimony was plainly extrinsic. In addition, it was not admissible under any theory of impeachment by contradiction. *See United States v. Chu*, 5 F.3d 1244, 1249 (9th Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1549, 128 L.Ed.2d 198 (1994) (citation omitted). The Government adduced no testimony regarding Irma's model parenthood or drinking habits that Ms. Kenton's precluded testimony could have contradicted. Accordingly, the district court did not abuse its discretion in refusing to allow Ms. Kenton to testify.

## IV.

Hinton's fourth contention of error is that various comments made and questions posed by the prosecution constituted prosecutorial misconduct prejudicing the jury and meriting a retrial. We disagree.

■ Where defense counsel objects at trial to acts of alleged prosecutorial misconduct, we review for harmless error on defendant's appeal; absent such an objection, we review under the more deferential plain error standard. *United States v. Endicott*, 803 F.2d 506, 513 (9th Cir.1986).

■ Hinton first argues that the prosecutor committed prosecutorial misconduct in detailing Hinton's prior acts to prove his violent character. Having concluded that this evidence was properly admitted and, relative to its probative purpose, not disproportionately prejudicial, we find no misconduct, much less reversible error, in the Government's presentation of the bad acts evidence.

■ Hinton also alleges prosecutorial misconduct occurred when the Government: (i) cross-examined Hinton as to whether he thought his visits to Brenda Kenton, a fortune teller, excused his violent behavior; (ii) questioned the victim about her subjective belief as to when she first thought her husband would kill her; and (iii) cross-examined Hinton regarding whether he thought the victim was lying. Because defense counsel objected at trial to each of these acts, we review for harmless error. *Endicott*, 803 F.2d at 513.

■ These contentions are unpersuasive because Hinton failed to demonstrate resulting prejudice. To obtain a reversal for prosecutorial misconduct, a defendant must demonstrate that he was prejudiced by the misconduct. *United States v. Christophe*, 833 F.2d 1296, 1301 (9th Cir.1987). "Reversal is warranted only if it is more probable than not that the [prosecutorial] misconduct materially affected the verdict." *Id.* The prosecution's alleged misconduct must be viewed in the context of the entire trial. *Id.* at 1300.

Here, no prejudice arose because the prosecutor's questions and comments at issue did not elicit a prejudicial response and did not permit the jury to make any negative inferences beyond those which other evidence already abundantly invited. As to the cross-

examination pertaining to Hinton's visits to a fortune teller, the district court struck the prosecutor's comment "[a]nd that gives you an excuse for your violent behavior." In addition, because Hinton answered "no" before his counsel objected, the bell to be unrung bode little ill for Hinton. The jury did not have to attempt to disregard an admission that Hinton stabbed Irma pursuant to an occult ritual or belief.

Similarly, the district court sustained defense counsel's objection before Hinton could respond to the Government's questioning regarding whether Hinton contended that the victim had lied during her testimony. The Government then ceased this line of questioning. These questions merely invited Hinton to give an answer that was obvious to the jury, given that an affirmative response would only repeat Hinton's contentions elsewhere in the record that the victim had "made up" prior act testimony and "is lying." In addition, scant residual prejudice could have arisen from the prosecutor's question, "when in your marriage did you first start to believe that your husband might kill you?" Properly admitted testimony already gave the jury ample ground to infer independently of this comment that at some time during the marriage Hinton threatened, and may have planned to make good his threat, to kill Irma.

■ Finally, Hinton argues that the prosecutor committed prosecutorial misconduct in commenting at closing argument on the seriousness of the crime and Hinton's future dangerousness. Hinton argues that under *Com. of Northern Mariana Islands v. Mendiola*, 976 F.2d 475 (9th Cir.1992), reversal is required to undo the prejudice resulting from the prosecutor's comments that only the jury "stands between [the victim] and Patrick Hinton" and that the defendant knew that the charged offense was a crime "serious enough to take you into Federal Court." Because defense counsel did not object to these comments at trial, we review for plain error. *Endicott*, 803 F.2d at 513.

In *Mendiola*, we found improper and unduly inflammatory the prosecutor's closing remark to the jury that "[i]f you say not guilty, he walks right out the door, right behind you." This comment was coupled with the insinuation that the defendant, if acquitted, would recover the ostensibly missing murder weapon and pose a threat to the general public after again becoming one of its members. We deemed this closing remark "commentary on a defendant's future dangerousness ... [that] is highly improper during the guilt phase of a trial." 976 F.2d at 487.

In contrast to the instant case, we emphasized in *Mendiola* that the comment was prejudicial only in view of the weakness of the prosecution's case, the prosecutor's disingenuity as to the whereabouts of the missing weapon, and the Government's resort to coercion to obtain evidence. *Id.* None of these factors, and accordingly no plain error, is present here, where artlessness more than artifice marked the Government's closing comments. We conclude that the record does not demonstrate that the alleged misconduct, viewed either individually or for cumulative error in the context of the entire trial, materially affected the verdict.

## V.

■ Hinton's final contention of error is that insufficient evidence supported the district court's finding that he inflicted a "permanent or life-threatening bodily injury" warranting a four-level enhancement under U.S.S.G. § 2A2.1(b)(1)(B). We disagree.

■ We review de novo a district court's interpretation of the United States Sentencing Guidelines (the Guidelines or U.S.S.G.). *United States v. James*, 957 F.2d 679, 680 (9th Cir.1992). We review the district court's findings of facts for clear error. *United States v. Taren–Palma*, 997 F.2d 525, 532 (9th Cir.1993).

Hinton argues that "[t]hough the victim may have suffered bodily injury, nothing presented to the trial court indicates that she has suffered lifetime disabilities or lifetime disfigurement." Hinton further asserts that "[n]o medical testimony was presented at trial, or at the sentencing hearing, which showed the victim faced a substantial risk of death because of the stab wounds." This argument fails to consider that the enhancement was premised not on infliction of a "permanent" injury under U.S.S.G. § 1B1.1,

but on that section's alternative, "life-threatening" prong. The only case cited by Hinton with regard to the life-threatening nature of the victim's injuries, *United States v. Martin,* 783 F.2d 1449 (9th Cir.1986), is distinguishable because the case did not pertain to U.S.S.G. § 1B1.1 or 2A2.1, or to the Guidelines in general.

Ample evidence of a life-threatening injury supported the sentencing court's factual findings on this issue. Numerous witnesses testified to the victim's considerable blood loss and corroborated her claim that Hinton prevented her from seeking medical treatment. A medical technician testified that Irma was in shock during the ambulance ride to the hospital and that he had to bench her wounds "to control the bleeding." In addition, the Government persuasively draws an analogy between Hinton's denial of access to medical assistance and the Sentencing Commission's illustration in the commentary to U.S.S.G. § 1B1.1(h), wherein a kidnapper's "maltreatment to a life-threatening degree (*e.g.,* by denial of food or medical care) would constitute life-threatening bodily injury."

Viewed in conjunction with Hinton's contemporaneous threat to kill the victim, the forceful blows, the profuse blood loss and the subsequent denial of access to medical treatment endangered the victim's life and thus constituted a "life-threatening bodily injury." Accordingly, we find no clear error in the four-level enhancement under U.S.S.G. § 2A2.1(b)(1)(B).

## CONCLUSION

For the foregoing reasons, we affirm Hinton's conviction of assault with intent to murder under 18 U.S.C. § 113(a).

**AFFIRMED.**