83 F.3d 430
 77 A.F.T.R.2d 96-2071, 96-1 USTC P 50,302
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert Michael STANDARD, aka: Robert Standard, Defendant-Appellant.
 No. 95-50069.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Dec. 11, 1995.
Decided April 26, 1996.
As Amended on Denial of Rehearing May 22, 1996.
 
 Before: HUG, Chief Judge, and BEEZER, and KLEINFELD, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Defendant Robert Standard appeals from convictions for two counts of subscribing to false income tax returns in violation of 26 U.S.C. § 7206(1), for two counts of bank fraud in violation of 18 U.S.C. § 1014, and for one count of bankruptcy fraud in violation of 18 U.S.C. § 152. He appeals the sentence imposed for those convictions. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742. We reverse in part, affirm in part, and remand for resentencing.
 
 
 3
 * In 1987, the State Bar of California commenced an investigation of one of its members, Robert Standard, a personal injury lawyer. He was investigated for misappropriating client funds, for misusing his trust account, and for using cappers in the solicitation of business.[1]
 
 
 4
 In order to obtain clients, Standard paid third parties, which he called "sources," for referrals. In his 1987 United States tax return, Standard excluded these referral fees from gross income by including them in "cost of goods sold" as "associate/atty fees." In his 1988 return, Standard deducted these referral fees from gross income by including them in "other expenses" as "sign ups."
 
 
 5
 Based on these reductions to income, Standard was indicted for two counts of tax fraud. The government's theory was that the referral fees were not properly included in "cost of goods sold" in 1987 and in "other expenses" in 1988, and therefore, those figures were overstated. The government alleged that Standard knew that these inclusions were improper and was guilty of two counts of tax fraud as a person who "[w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter." 26 U.S.C. § 7206(1).
 
 
 6
 As a result of the investigation by the California State Bar for, among other things, capping, Standard left his law firm and resigned from the bar. While his troubles with the bar were ongoing, Standard applied for two bank loans to enable him to purchase land and to construct a luxury residence. First Pacific Bank loaned him $966,500 and Topa Savings Bank extended him a line of credit for $1,800,000. The government contends that Standard made material false statements in his loan applications about his law practice and his status as an attorney. He was indicted for two counts of bank fraud under 18 U.S.C. § 1014.
 
 
 7
 Standard's troubles ultimately led to his bankruptcy. When he filed his initial bankruptcy schedule of assets and liabilities, Standard failed to disclose that he had an investment in Transwestern Oil and Gas, and he did not amend that schedule to include the investment during his bankruptcy. Standard claimed that he did not do so because the investment was a worthless investment sold to him by a con-man. The government, however, claimed that Standard had an expectancy of receiving some of his investment back and that he was negotiating for such a return. Standard was indicted for bankruptcy fraud pursuant to 18 U.S.C. § 152 for concealing this asset.
 
 II
 
 8
 Standard first appeals his convictions for two counts of tax fraud pursuant to 26 U.S.C. § 7206(1). The elements of the crime proscribed by section 7206(1) are:
 
 
 9
 (1) the defendant made and subscribed a return, statement, or other document that was incorrect as to a material matter; (2) the return, statement, or other document subscribed by the defendant contained a written declaration that it was made under the penalties of perjury; (3) the defendant did not believe the return, statement, or other document to be true and correct as to every material matter; and (4) the defendant falsely subscribed to the return, statement, or other document willfully, with the specific intent to violate the law.
 
 
 10
 United States v. Marabelles, 724 F.2d 1374, 1380 (9th Cir.1984). A tax deficiency is not an element of this crime. Id.
 
 
 11
 Standard was indicted for two counts of subscribing to a false tax return in violation of section 7206(1). Count one charged that Standard's 1987 income tax return overstated his exclusion for "cost of goods sold," and count two charged that Standard's 1988 income tax return overstated his deduction for "other [business] expenses." Standard included in these items payments made to cappers to solicit business. Standard was convicted on both counts.
 
 
 12
 Standard contends that the government failed to prove that he was not entitled to include his capping expenses in "cost of goods sold" or "other [business] expenses." He contends that his convictions pursuant to 7206(1) must be reversed because the government failed to prove the first element of the offense, that the defendant made and subscribed a return that was incorrect as to a material matter. There is sufficient evidence to support a conviction if, reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. United States v. Vgeri, 51 F.3d 876, 879 (9th Cir.1995).
 
 
 13
 The government argues that Standard's material misstatement consisted of excluding in 1987 and deducting in 1988 capping payments which were illegal under California law and therefore nondeductible under 26 U.S.C. § 162(c)(2). Section 162(a) allows a deduction for ordinary and necessary business expenses. Section 162(c)(2) provides that no deduction shall be allowed for a payment "if the payment constitutes an ... illegal payment under ... any law of a State (but only if such State law is generally enforced), which subjects the payor to a criminal penalty or the loss of license or privilege to engage in a trade or business."[2]
 
 
 14
 * Standard argues that his count one conviction must be reversed because section 162(c)(2) only applies to deductions, and does not apply to exclusions. We agree. Despite the government's argument that whether Standard excluded the fees or deducted them is merely "semantics," the distinction is very real. In Max Sobel Wholesale Liquors v. Commissioner, 630 F.2d 670 (9th Cir.1980), we held that section 162(c)(2) applies only to deductions, not to exclusions, and that kickbacks which are nondeductible under section 162(c)(2) may be excluded from gross income if they can be classified as components of cost of goods sold.
 
 
 15
 The government argues that Max Sobel is distinguishable because in Standard's case there were no goods sold and therefore Standard made a misstatement by including his payments in cost of goods sold. The government is correct, but its distinguishing of Max Sobel does not get it very far. Section 7206(1), in addition to a misstatement, requires knowledge and willfulness. The government put on evidence that Standard knew the capping payments were illegal and that he knew he could not deduct them, but it did not put on any evidence that Standard knew he could not exclude them as cost of goods sold or that he willfully listed them as cost of goods sold with the specific intent to file a false tax return. We reverse Standard's count one conviction.
 
 B
 
 16
 Count two, on the other hand, was based on an allegedly improper deduction, and thus section 162(c)(2) applies. The government contends that the payments deducted were "illegal" under California law. Section 6152(a)(1) of the California Business and Professions Code provides that it is unlawful for any person to act as a capper for an attorney. Section 6152(a)(2) provides that it is unlawful for any person, including an attorney, to solicit another person to violate subsection (a)(1). The government argues that Standard violated section 6152(a)(2) by paying his cappers. Standard argues that his payments did not violate section 6152(a)(2) because section 6152(a)(2) prohibits soliciting cappers, not paying cappers. This part of the case turns on whether payments to cappers are illegal under the California statute.
 
 
 17
 If an activity is illegal, but the payments associated with it are not, then the payments may be deductible. In Commissioner v. Sullivan, 356 U.S. 27, 27 (1958), the Supreme Court held that "amounts expended to ... hire employees for the conduct of alleged illegal ... enterprises are deductible as ordinary and necessary business expenses." The Court stated that "[d]eductions are a matter of grace and Congress can, of course, disallow them as it chooses," but if Congress has not spoken, business expenses are deductible. Id. at 28. The Court held that bookies could deduct rent and wages paid to operate their illegal gambling businesses.
 
 
 18
 After Sullivan, Congress amended the statute, by adding section 162(c)(2):
 
 
 19
 No deduction shall be allowed under subsection (a) for any payment ... made, directly or indirectly, to any person, if the payment constitutes an illegal bribe, illegal kickback, or other illegal payment under any law of the United States, or under any law of a State (but only if such State law is generally enforced), which subjects the payor to a criminal penalty or the loss of license or privilege to engage in a trade or business. For purposes of this paragraph, a kickback includes a payment in consideration of the referral of a client, patient, or customer....
 
 
 20
 26 U.S.C. § 162(c)(2).
 
 
 21
 Under this tax law, the deduction is not allowed if the "payment constitutes" the bribe or kickback or is an "illegal payment." Assuming the statute prohibiting bookmaking did not prohibit bookies from paying their rent, the bookies could still deduct their rent under Sullivan, despite the statutory change.
 
 
 22
 Only if the payment is illegal under a generally enforced state law is it nondeductible. Thus, while payments for illegal activities may be deductible, payments which are themselves illegal are not. The payment, not just the activity with which the payment is associated, must be illegal, to cause subsection 162(c)(2) to operate.
 
 
 23
 California law makes it a crime "to solicit" a person to act as a capper. Cal.Bus. & Prof.Code § 6152(a)(2). Standard urges that solicitation is complete when the lawyer asks a capper to get him a client, so the payment itself is not a crime. We disagree. While Standard would have been guilty of solicitation had he merely requested his capper to get him a client, the payment did not vitiate the request, nor was it separable from it; it was the inducement which gave the request persuasiveness. To analogize this case to Sullivan, paying the capper is more like bribing an official, than like paying the rent. The payment itself, not just the activity it was associated with, was illegal.
 
 
 24
 "Solicitation consists of the asking of another to commit [a] specified [crime] with intent that the crime be committed." People v. Gordon, 120 Cal.Rptr. 840, 843-44 (Ct.App.1975). Solicitation is a "distinct offense, and is punishable irrespective of the reaction of the person solicited; i.e., the solicitor is guilty even though that person immediately rejects the request or proposal." Hutchins v. Municipal Court of Santa Monica, 132 Cal.Rptr. 158, 165 (Ct.App.1976). "Unlike other criminal offenses, in the crime of 'solicitation' the harm is the asking--nothing more need be proven." People v. Miley, 204 Cal.Rptr. 347, 352 (Ct.App.1984). "The solicitation, without more, is regarded as a sufficient act to take the case out of the sphere of unpunishable intent." Clark & Marshall, Crimes 223 (7th ed. 1967).
 
 
 25
 The definition of soliciting as merely asking, does not imply that paying someone to commit a crime is not or can not be solicitation. The leading case on solicitation is State v. Schleifer, 121 A. 805 (Conn.1923). The defendant gave a speech, which appears from context to be addressed to striking employees of the New Haven Railroad. He suggested that they "take [scabs] in a dark alley and hit them with a lead pipe," "[d]on't forget to bump off a few now and then," and "take the brake-shoe and put it under something that will put the cars off the irons." Id. at 805. The court said that solicitation was distinguished from unpunishable intent because "solicitation is an act." Id. at 806. The court went on to say that the precedents did not require the solicitation to mature to the point of being an attempt.
 
 
 26
 Defendant argued in Schleifer that solicitation cases where money was paid should be read as attempt, rather than solicitation, cases, in order to avoid extending their principles to his case. The court rejected this distinction, saying "it does not change its character if the solicitation to crime is accompanied by a bribe and as an inducement to its commission." Id. at 807. Likewise in Standard's case, the solicitation does not lose its character as a solicitation because accompanied by a promised bribe as an inducement to its commission, nor is the bribe separable from the crime, as paying the rent was separable from placing bets in Sullivan.
 
 
 27
 The point of the traditional statement, that asking, without more, is solicitation, is not to decriminalize inducements, but to criminalize mere requests. Soliciting in its ordinary meaning means trying to get another person to do something. If it is something which the person might wish to do for his own reasons, as in the striking railroad employees case, then the excitement or suggestion produced by the words may suffice to bring about the solicitor's desired result. If it is something which the hearer has no personal desire to do, as when a lawyer or doctor asks people to bring him clients or patients, then money may be needed to induce the person solicited to act upon the solicitation.
 
 
 28
 It would not have made sense for the California legislature to say to lawyers, "you may not ask people to send you clients, but if you do, then you may pay them." The money would ordinarily be intended by the solicitor to give the recipient of the solicitation a reason to act on it. We should not interpret statutes to defy common sense. See Cook Inlet Native Ass'n v. Bowen, 810 F.2d 1471, 1474 (9th Cir.1987). We conclude that by criminalizing solicitation of cappers, California criminalized paying people to induce them to act as cappers.
 
 
 29
 Standard's argument that the government failed to prove that section 6152(b)(2) is generally enforced also fails. A rational trier of fact could have found that sufficient evidence showed that section 6152(b)(2) was generally enforced. Under section 162(c)(2), the state law may "subject the payor to a criminal penalty or the loss of license or privilege to engage in a trade or business." 26 U.S.C. § 162(c)(2). The deputy city attorney testified that lawyers were prosecuted for violating section 6152(b)(2), and the senior counsel of the state bar testified that lawyers have been disbarred for violating section 6152(b)(2).
 
 C
 
 30
 Standard raises several other challenges to his conviction for count two. Standard first contends that he was improperly indicted for subscribing to a false tax return and that he should instead have been indicted for tax evasion pursuant to 26 U.S.C. § 7201. This is a question of law which this court reviews de novo. United States v. Rosi, 27 F.3d 409, 414 (9th Cir.1994). Standard argues that the government's theory was that he was not entitled to reduce his gross income by the payments made to his cappers, not that he did not in fact make the payments. Because he actually incurred the capping expense, he argues, the figures he entered on his return were "true," and in turn, there was no material misstatement of fact.
 
 
 31
 Standard's argument fails. "Other [business] expenses" is a legally defined concept. Only those expenses which are legally allowable may be included in this schedule. When a taxpayer reports a figure, he is representing that it is an allowable deduction under the law. If it is not, he has made a misstatement, and he has potentially violated section 7206(1). See, e.g., United States v. Greenberg, 735 F.2d 29 (2d Cir.1984) (defendant guilty of subscribing to false tax return for classifying expenditures as business expenses when they were for personal benefit); United States v. Rayor, 204 F.Supp. 486 (S.D.Cal.1962) (defendant guilty of subscribing to false tax return for deducting personal gambling loss as a legitimate business expense). Therefore, because the government's theory was that Standard could not legally include his capping expense in "other [business] expenses," indictment under section 7206(1) was appropriate.
 
 
 32
 Standard also argues that the government failed to prove the fourth element of count two, that he falsely subscribed to the return, statement, or other document, willfully, with the specific intent to violate the law.
 
 
 33
 To prove wilfulness under section 7206(1), the government must show that the defendant did not have a good faith misunderstanding of the law or a good faith belief that he was not violating the law. Cheek v. United States, 498 U.S. 192, 201 (1990). Rather, the defendant "intended to violate the law or knew that his actions would do so." United States v. Claiborne, 765 F.2d 784, 797 (9th Cir.1985). Wilfulness may be proven with "circumstantial evidence indicating that defendant knew or must have known that his returns were false." Id. at 797-98.
 
 
 34
 There was sufficient evidence for a rational trier of fact to find that Standard knew that capping was illegal and that his payments to cappers were nondeductible. Standard's former employees testified that everyone in the office knew capping was illegal. The California Bar sent Standard letters telling him it was illegal, and he responded that he had not hired cappers. A former capper testified that Standard told him that capping was "just a misdemeanor and usually they don't prosecute those." Standard's tax preparer also testified that before filing Standard's 1988 tax return, he and Standard discussed the nondeductibility of illegal payments, including referral payments by doctors. Together the tax preparer and Standard consulted the United States Master Tax Guide to determine whether Standard's payments were illegal, and Standard assured him that his capping payments were "in a backhanded way" legal.
 
 
 35
 Standard also raises four constitutional challenges to his conviction under count two. He argues that section 162(c)(2) violates his privilege against compulsory self-incrimination and violates equal protection, that his prosecution under section 7206(1) for taking a deduction illegal under section 162(c)(2) violates due process, and that section 6152 violates his free speech rights. Standard did not raise these issues at the district court. We will not exercise our discretion to hear these issues on appeal. See Abex Corp. v. Ski's Enter., 748 F.2d 513, 516 (9th Cir.1984) (holding that a party may not generally raise new issues on appeal and that it is a matter of discretion whether to entertain such issues).
 
 
 36
 Standard also argues that the district court gave erroneous jury instructions for his tax fraud convictions. He agreed to the instructions given by the court at trial, without objecting. Therefore, we will review the instructions for plain error only. United States v. Ponce, 51 F.3d 820, 830 (9th Cir.1995). "Plain error will be found only where necessary to prevent a miscarriage of justice or to maintain the integrity of the judicial process." Id. Standard argues that the district court erred: by failing to give instructions on state law and its applicability under section 162(c)(2), by failing to give specific intent instructions, by saying that "illegal payments" are not deductible, by telling the jury that kickbacks are not deductible, and by giving an incorrect good faith instruction.
 
 
 37
 The district court's actions in these instances do not rise to the level of plain error. The district court instructed that "the State Bar is authorized to enforce state law and has the power to enforce and investigate the unlawful solicitation of clients, which includes payment to nonlawyers for capping." The court also specified that section 162(c)(2) applies "only if such state law is generally enforced." The district court also instructed that "to act willfully, ... means to act voluntarily and deliberately and intending to violate a known legal duty." The court did not commit plain error by telling the jury that illegal payments are not deductible from gross income or that kickbacks are illegal as the court specified that "[t]he law forbids the deducting of any payment ... if the payment constitutes an illegal bribe, kickback, or other illegal payment under any law of the United States or any law of a state, but only if such state law is generally enforced and subjects the individual to a criminal penalty of loss of license or privilege to engage in a trade or business." Finally, the district court's good faith instruction adequately instructed the jury that a person who acts on a good faith belief "is not punishable under this statute merely because that honest belief turns out to be incorrect or wrong."
 
 
 38
 Standard challenges his tax fraud conviction by arguing that the underlying indictment was improper because the government misrepresented the law to the grand jury. Because Standard did not raise an objection prior to trial, this objection is waived. See United States v. Smith, 866 F.2d 1092, 1097-98 (9th Cir.1989); Fed.R.Crim.P. 12(b).
 
 
 39
 Finally, Standard argues that his cross-examination of witnesses was unfairly limited. We review a district court's decision to limit cross-examination for abuse of discretion. United States v. Brown, 936 F.2d 1042, 1048 (9th Cir. 1991).
 
 
 40
 Standard argues that the district court unfairly curtailed his cross-examination of Victoria Molloy, a senior counsel of the state bar, and of Edmond Fimbres, a city attorney. The district court correctly exercised its discretion to limit Standard's irrelevant questions about direct solicitation by lawyers and the prevalence of capping cases at a time unrelated to the period at issue in his case.
 
 
 41
 Standard's conviction under count two is affirmed.
 
 III
 
 42
 Standard was convicted of two counts of bank fraud pursuant to 18 U.S.C. § 1014. Section 1014 provides that it is a felony for a person to knowingly make a false statement for the purpose of influencing the action of, among other entities, a bank insured by the Federal Deposit Insurance Corporation.
 
 
 43
 Standard appeals his convictions claiming that the district court was not entitled to take judicial notice that the banks involved were insured by the FDIC.[3] We review a decision to take judicial notice under Fed.R.Evid. 201 for an abuse of discretion. United States v. Chapel, 41 F.3d 1338, 1342 (9th Cir.1994), cert. denied, 115 S.Ct. 2017 (1995).
 
 
 44
 At the conclusion of his trial, Standard moved under Fed.R.Crim.P. 29 for acquittal on his bank fraud counts because the government failed to prove that the two banks involved were insured by the FDIC. The court responded by suggesting that it could take judicial notice of the fact because it was a "governmental act." The government then requested that such judicial notice be taken claiming that the bank loan applications indicated that the banks were federally insured. The government on appeal now admits that these applications do not contain this information. Thus, the district court took judicial notice of the FDIC insurance without any supporting evidence.[4]
 
 
 45
 The government argues that the district court did not abuse its discretion by taking judicial notice of the FDIC insurance despite the lack of any evidence because FDIC insurance is a fact "not subject to reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). The government supports its argument by quoting a sentence in Chapel that states, "the FDIC, the insuring agency itself, is a 'source whose accuracy cannot be reasonably questioned.' " Chapel, 41 F.3d at 1342. The government argues that because a person could check with the FDIC to determine if the banks in question were FDIC insured, and the FDIC is an accurate source, the court acted properly by taking judicial notice of the FDIC insurance.
 
 
 46
 The government's reliance on Chapel is misplaced. In Chapel, the government introduced at trial both a certificate of FDIC insurance and the testimony of a witness that after a search of the FDIC records, no record was found terminating that insurance. We first held that this evidence was sufficient to establish that the bank was insured on the date of the crime. Id. at 1341. We then went on to discuss the fact that the district court took judicial notice of the FDIC insurance, and held that the district court did not err by doing so. In this discussion, we noted that the evidence of the FDIC insured status introduced at trial was "substantial and undisputed." Id. at 1342. Specifically, we pointed to the evidence of the FDIC certificate and the evidence submitted that the FDIC did not have a record of terminating this insurance. We then held that "[b]ased on this evidence, we hold that the fact of the Bank's FDIC insured status was not subject to reasonable dispute and that the district court did not err by taking judicial notice pursuant to Rule 201." Id. (emphasis added).
 
 
 47
 Chapel merely stands for the proposition that because there was overwhelming evidence of FDIC insurance submitted, the court's comment on the FDIC insurance issue was permissible. This holding comports with Schoepflin v. United States, 391 F.2d 390 (9th Cir.), cert. denied, 393 U.S. 865 (1968), an earlier case dealing with this same issue. In Schoepflin, the evidence introduced on the issue of FDIC insurance was substantial and undisputed, and we held that "the trial court's statement concerning judicial notice constituted no more than a permissible comment on the evidence." Id. at 397.
 
 
 48
 The taking of judicial notice during Standard's trial was not supported by any evidence and was not a permissible comment on the evidence. The government did not introduce either a certificate of insurance or any testimony that the banks involved were FDIC insured on the date of the alleged crime. The district court's use of judicial notice effectively eliminated the FDIC element of the offense. Just because it might be easy to prove FDIC insured status does not mean that the government need not prove it. All banks are not FDIC insured. Whether the banks from which Standard obtained loans were insured by the FDIC is subject to reasonable dispute.[5] Because judicial notice on this issue was improper and the government failed to introduce any relevant evidence on the FDIC element of the charged offense, Standard's convictions for counts three and four are reversed.
 
 IV
 
 49
 Standard's final conviction was for one count of bankruptcy fraud pursuant to 18 U.S.C. § 152. Section 152 provides that a person may be imprisoned and fined if he "knowingly and fraudulently conceals from the custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or from creditors in any case under title 11, any property belonging to the estate of a debtor." Standard was indicted for concealing from his creditors and the trustee his investment in Transwestern Oil and Gas. Standard appeals this conviction on several grounds.
 
 
 50
 * Standard first argues that the evidence introduced was insufficient to convict him of bankruptcy fraud because there was no evidence that any property was concealed. There is sufficient evidence to support a conviction if, reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Vgeri, 51 F.3d at 879.
 
 
 51
 Standard argues that his Transwestern investment was worthless when he filed his bankruptcy schedules on June 21, 1991. He claims that worthless assets need not be scheduled. His argument is primarily based on his testimony that he thought his investment was worthless based on, among other things, a representation made to him by Roy Scarborough, a special master appointed by a United States district court to search for an seize assets of Transwestern. Scarborough sent a letter in August of 1991 informing the investors that Transwestern appeared to have no recoverable assets besides items such as office furniture, cars, and paintings in the office.
 
 
 52
 Despite Standard's argument to the contrary, there was more than sufficient evidence for a jury to conclude that he expected some recovery from his Transwestern investment and that he failed to disclose that expectancy. Scarborough testified that Standard contacted him regularly and repeatedly beginning in June, 1991 and continuing throughout his bankruptcy about the possibility of recovering money from his investment. Furthermore, during Standard's voluntary bankruptcy, Scarborough informed him in November, 1991 of a court disgorgement order, and in November, 1992, Scarborough told him that he would likely get some money. Standard did not amend his bankruptcy schedules based on this information. This is sufficient evidence to support Standard's conviction.
 
 B
 
 53
 Standard next argues that his confrontation rights were violated when Lawrence Diamont, the bankruptcy trustee, testified to the following:
 
 
 54
 Out of the blue, I received a telephone call, to the best of my recollection, either the last day or two of October, or the first day or two of November [1993], from a Mr. Ehrman [a Transwestern employee], who informed me that he had been negotiating with Mr. Standard for a period of time, several months, with regard to how much money Mr. Standard was entitled to out of his partnership interest in Transwestern Oil and Gas; that Mr. Ehrman had found out that Mr. Standard was in bankruptcy, and that, therefore, Mr. Ehrman proposed to send money to me as the bankruptcy trustee.
 
 
 55
 Standard claims that this evidence was hearsay introduced to establish his state of mind, an element of the crime, and that because Ehrman was not produced as a witness, Standard's confrontation rights were violated. Standard argues this despite the fact that he made no objection at trial.
 
 
 56
 Standard did not raise this issue at trial, and he has briefed it poorly here. We will not exercise our discretion to consider this issue on appeal. See Abex, 748 F.2d at 516 (holding that party may not generally raise new issues on appeal and that it is a matter of discretion whether to entertain such issues).
 
 C
 
 57
 Standard's third challenge to his bankruptcy fraud conviction is based on alleged deficient jury instructions. He argues that a special unanimity instruction and a materiality instruction should have been given. At trial, Standard agreed to the instructions that were given by the court and did not object to the instructions as given.[6] When there is no objection to jury instructions at trial, we review only for plain error. Ponce, 51 F.3d at 830. Plain error is found only where necessary to prevent a miscarriage of justice or to maintain the integrity of the judicial process. Id. We find no such error.
 
 
 58
 Standard argues that a special unanimity instruction should have been given because the indictment accused him of concealing his property from both his creditors and the trustee. Standard argues that the jury should have been instructed that it had to agree on the person or entity from whom the property was concealed. Not giving such an instruction was not error because Standard's actions of concealment concealed the property from both the creditors and the trustee. Given the evidence, the jury had to find either that it was concealed from both or neither. There was no evidence that it was concealed from one but not the other.
 
 
 59
 Standard's argument that the lack of a materiality instruction constituted plain error also fails. He argues that the court should have given an instruction that the concealment had to be material. Materiality is not an element of this crime, however, and thus no error was committed. See, e.g., United States v. Grant, 971 F.2d 799, 808-09 (1st Cir.1992).
 
 D
 
 60
 Standard next challenges his bankruptcy fraud conviction on the ground that the proof deviated from the indictment, thus constituting a constructive amendment in violation of the Fifth Amendment. He argues that since the $66,875 ultimately was paid by JNE offshore, not Transwestern, he could not have concealed an asset in Transwestern as the indictment charges. This argument fails. Standard's interest in Transwestern was the basis upon which he expected to receive a payment. That he ultimately did receive a payment from an "alter ego" company is irrelevant. His expectancy interest in Transwestern was concealed, and thus the proof accords with the indictment.
 
 E
 
 61
 Standard next challenges his bankruptcy fraud conviction by arguing that the district court erred by limiting his direct and cross-examination of witnesses to such an extent as to deprive him of a fair trial.[7] It is the district court's province to determine the "relevance of a given topic and the extent of cross-examination to be permitted on that topic." Brown, 936 F.2d at 1048. We review a district court's decision to limit cross-examination for an abuse of discretion. Id. at 1047-48. We also review evidentiary rulings for an abuse of discretion. United States v. Manning, 56 F.3d 1188, 1196 (9th Cir.1995).
 
 
 62
 Standard argues that his cross-examination of Lawrence Diamont, the bankruptcy trustee, was unfairly curtailed. He complains that he should have been able to establish that the $66,875 check was attributable to JNE and not to Transwestern. His questions were irrelevant because the undisclosed asset was his expectancy, not the $66,875 fulfillment of that expectancy. There was no abuse of discretion.
 
 
 63
 Standard also argues that his own direct examination was unfairly curtailed. It was not. The district court properly sustained objections to questions which were irrelevant, were leading, or sought a hearsay response.
 
 F
 
 64
 Standard further contends that his bankruptcy fraud conviction was invalid because of improper remarks made by the prosecution in its closing argument. Because Standard did not object to the remarks at trial, we review for plain error. United States v. Hinton, 31 F.3d 817, 824 (9th Cir.1994), cert. denied, 115 S.Ct. 773 (1995). Plain error is present " 'solely in those circumstances in which a miscarriage of justice would otherwise result.' " United States v. Young, 470 U.S. 1, 15 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n. 14 (1982)). Plain error did not occur here.
 
 
 65
 Standard first contends that the government's use of the phrase "Mr. Felon" was meant to refer to him and was unduly prejudicial. Standard, however, mischaracterizes the statement. The prosecutor used "Mr. Felon" to refer to Joseph Lee, one of Standard's cappers and a convicted felon, not to refer to Standard. Therefore, Standard's argument for why the use of "Mr. Felon" was prejudicial is unsupported.
 
 
 66
 Second, Standard contends that the prosecutor's statements that Standard placed himself "above and outside the law," and that Standard "didn't think twice about asking people to violate the law" resulted in a miscarriage of justice. We disagree. These comments were supported by the evidence presented that Standard solicited cappers and that he told at least one of them that capping was merely a misdemeanor. Furthermore, because these comments were made in reference to the tax fraud counts, which we have reversed, and not in reference to the bankruptcy fraud count, there was no prejudice.
 
 V
 
 67
 Standard's final challenge to his convictions is based on his argument that his tax fraud, bank fraud, and bankruptcy fraud cases should not have been tried together and that the district court improperly denied his motion to severe. Because Standard failed to renew his motion for severance at the close of evidence, this objection is waived. United States v. Restrepo, 930 F.2d 705, 711 (9th Cir.1991).
 
 VI
 
 68
 Finally, in addition to challenging his convictions, Standard challenges his sentencing under the Sentencing Guidelines. Because we have reversed his count one tax fraud conviction and his bank fraud convictions, a sentence must be reimposed, and we need not address these contentions. We remand for resentencing.
 
 VII
 
 69
 We reverse Standard's count one conviction for subscribing to a false income tax return in violation of 26 U.S.C. § 7206(1) and his convictions for two counts of bank fraud in violation of 18 U.S.C. § 1014. We affirm Standard's count two conviction for subscribing to a false income tax return in violation of 26 U.S.C. § 7206(1) and his conviction for bankruptcy fraud in violation of 18 U.S.C. § 152. We remand for resentencing.
 
 
 70
 AFFIRMED in part, REVERSED in part and REMANDED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or used by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 A capper, under California law, is a person who acts as "an agent for an attorney at law ... in the solicitation or procurement of business for such attorney" Cal.Bus. & Prof.Code § 6151(a)
 
 
 [2]
 As interpreted by the IRS, "State law means a statute of a State." 26 C.F.R. § 1.162-18(b)(2)
 
 
 [3]
 Proof that a financial institution was federally insured at the time of the allegedly false statement is a necessary element of the offense under section 1014. United States v. Bellucci, 995 F.2d 157, 160 (9th Cir.1993)
 
 
 [4]
 The government on appeal argues that there was evidence of FDIC insurance introduced for one of the two banks, First Pacific Bank. However, the government's argument lacks merit. It points to the fact that one of the bank employees offhandedly noted that his bank had been taken over by the FDIC sometime after the loan in question and that Standard's bankruptcy schedules, filed almost two years after the loan, noted that the FDIC was the successor in interest to First Pacific Bank. This evidence fails because it is irrelevant to the issue whether the bank was FDIC insured on the date the charged offense occurred. See Chapel, 41 F.3d at 1340-41 (holding that while introduction of certificate of insurance was not sufficient, government met burden by introducing evidence that certificate was valid on date of the crime)
 
 
 [5]
 The government argues that district courts may take judicial notice of elements of offenses and cites to United States v. Gold, 378 F.2d 588 (9th Cir.1967), among other cases, to support this argument. In Gold, the district court took judicial notice of the fact that United Airlines was a common carrier engaged in interstate commerce. We held that the fact that United Airlines was so engaged was "indisputable." Id. at 593. In this case, the fact that the banks involved were FDIC insured is not "indisputable." As Standard so simply explains, "insurance cannot be inferred from the fact that a bank is a bank."
 
 
 [6]
 The only problem with the instructions came when the district court failed to give the good faith instruction agreed upon by the parties. The government brought this to the court's attention, and the court then gave the instruction. Standard did not object to the instruction
 
 
 [7]
 Standard also complains that the testimony of witnesses relevant to the bank fraud counts was unfairly curtailed. Because we reverse his convictions under those counts on other grounds, we need not address these contentions