197 F.3d 966 (9th Cir. 1999)
 UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
VASAK SARKISIAN, Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
VITALY SEMENOV, Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
ASHOT MIKAYELYAN, Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
SERGEY IVANCHIKOV, Defendant-Appellant.
 Nos. 98-10241, 98-10242, 98-10250, 98-10261
 U.S. Court of Appeals for the Ninth Circuit
 Argued and Submitted June 14, 1999
Filed December 3, 1999
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 COUNSEL: Sandra Gillies, Woodland, California, Karen L. Landau, Oakland, California, Jeffrey L. Staniels, Senior Assistant Federal Public Defender, Sacramento, California, Jolie S. Lipsig, Sacramento, California, for the defendants-appellants.
 Mary L. Grad, Assistant United States Attorney, Sacramento, California, for the plaintiff-appellee.
 Appeals from the United States District Court for the Eastern District of California; Edward J. Garcia, District Judge, Presiding. D.C. Nos. CR-96-00928-EJG, CR-96-00928-1-EJG, CR-96-00928-3-EJG
 Before: Mary M. Schroeder, Betty B. Fletcher, and Robert Boochever, Circuit Judges.
 OPINION
 BOOCHEVER, Circuit Judge:
 
 
 1
 Defendants Ashot Mikayelyan, Vitaly Semenev, Vasak Sarkisian, and Sergey Ivanchikov appeal their trial convictions and sentences imposed for numerous counts of trafficking in altered motor vehicle parts and one count of conspiracy to violate the Motor Vehicle Theft Prevention Act, 18 U.S.C. SS 511-511A, 42 U.S.C. S 14171. Mikayelyan appeals his conviction and sentence imposed for one count of collection of an extension of credit by extortionate means, and Semenov
 
 
 2
 appeals the trial court's denial of his motion for acquittal on that charge.
 
 
 3
 We have jurisdiction pursuant to 28 U.S.C. S 129[1]. We affirm.
 
 FACTS
 I. The Stolen Car and Auto Parts Conspiracy
 
 4
 This case stems from a multi-defendant scheme trafficking in stolen cars and auto parts. Participating in the scheme were, among others, defendants Vitaly Semenov, Ashot Mikayelyan, Sergey Ivanchikov, and Vasak Sarkisian. Starting at least as early as January 3, 1995, the defendants would regularly steal cars in and around Sacramento, California and bring them to an automobile repair shop operated by Mikayelyan. Some of the cars would then be taken apart and stripped for their parts. The remaining cars would undergo a "VIN switch," whereby the car's vehicle identification number ("VIN") would be replaced with that of another, "salvaged" car1 to disguise the stolen car's identity.
 
 
 5
 The scheme was headed by Mikayelyan, who owned the repair shop and directed much of the activity. The remaining participants were paid by Mikayelyan to steal cars and car parts, and to perform the VIN switches.
 
 
 6
 On April 12, 1996, police agents went to Mikayelyan's repair shop. When they arrived, they saw Ivanchikov exit the garage and leave. They then pulled up to the garage door, identified themselves, and asked for identification. Semenov ran out and was able to evade arrest. Inside the garage, agents found a dismantled red Honda with its VIN sticker removed, as well as many stolen car parts. The police arrested several participants found at the scene.
 
 
 7
 A short while after the raid, the police arrested Ivanchikov nearby at another repair shop. On Ivanchikov's person, officers found a business card for a storage rental room in a facility in Sacramento. The officers obtained the rental agreement from the facility manager and learned that it had been rented by Alex Bedrik, an unindicted co-conspirator in the car stealing scheme, on behalf of and in the name of his grandmother. Bedrik, Mikayelyan, and Ivanchikov were listed on the agreement as people authorized to access the storage room. Because Ivanchikov and Mikayelyan were on searchable state probation, the police did not obtain a search warrant before cutting the padlock off the gate of the storage room and searching its contents. Inside, officers found numerous car parts and evidence of tampering with identification labels.
 
 II. Extortion Attempt
 
 8
 Over the year preceding these events, a dispute arose between Mihran Karapogosian and his brother-in-law, Shage Pogosian, over a $140,000 debt allegedly owed by Karapogosian to Pogosian. Pogosian contacted Mikayelyan and asked for Mikayelyan's assistance in collecting the debt. Mikayelyan arranged for some of the participants in the car stealing conspiracy, including Semenov, Sarkisian and Ruslan Gabareyev, to go to Glendale, California, to intimidate Karapogosian into paying the alleged debt to Pogosian. Specifically, Gabareyev testified that 30 minutes prior to departing for Glendale, he spoke with Mikayelyan, who told Gabareyev that "[Bekaryn] will tell you more over there on the way there, and when you guys get there you guys, [Bekaryn] tell you guys what you got to do there." Bekaryn supplied Semenov and Gabareyev with guns.
 
 
 9
 On February 12, 1996, armed with those guns, Sarkisian, Gabareyev and Semenov visited Karapogosian at his workplace. They told Karapogosian: "You have to pay your debts to your brother-in-law. That's why we come down and ask for it." They added: "The debt, you have to pay him. We don't care how you gonna get it. When you gonna get it? " Finally, they told Karapogosian that if he did not pay the debt, a "bad thing" was going to happen to him. Before leaving Karapogosian's office, they showed their guns to Karapogosian to intimidate him.
 
 III. The Indictment & Trial
 
 10
 The first superseding indictment included seven counts of violating the Motor Vehicle Theft Prevention Act (counts 17), and two counts of conspiracy to collect a debt by extortionate means (counts 8 & 9). Count 1 charged all defendants with conspiracy to alter or remove motor vehicle identification numbers (VINs) and trafficking in certain motor vehicles and motor vehicle parts, in violation of 18 U.S.C.SS 371, 511, and 2321. Counts 2 through 7 charged all defendants with trafficking in certain motor vehicles and motor vehicle parts, in violation of 18 U.S.C. S 2321. Count 9 charged Mikayelyan, Semenov, Bekaryn, and Sarkisian under 18 U.S.C. S 894 for the 1996 Glendale extortion incident. Count 8 is not at issue in this appeal.
 
 
 11
 Prior to trial, Sarkisian, Ivanchikov, Semenov and Mikayelyan moved the district court under Federal Rule of Criminal Procedure 8(b) to sever count 9, the extortion count, from the auto theft and VIN-switch counts. Based on the prosecutor's offer of proof linking the extortion count to the other counts, and on further concerns about judicial efficiency, the district court denied the motion. At the close of the government's case and again at the close of evidence, the defendants moved under Rule 14 to sever the extortion count. The district court deferred ruling on those motions until after the verdicts were returned, but ultimately denied them as well.
 
 
 12
 At trial, the government offered evidence of the conspiracy to traffic in stolen cars and auto parts. During the trial, a problem with two jurors arose, and they were excused by the district court. The jury ultimately convicted Mikayelyan, Sarkisian, and Semenov on all charges. Ivanchikov was convicted of counts 1-7, and Bekaryn was convicted of count 9. The district court granted new trials to Bekaryn, Sarkisian and Semenov on count 9. The district court denied the defendants' Rule 29 motions for judgments of acquittal, and Rule 14 motions for a new trial based on prejudicial joinder.
 
 DISCUSSION
 I. Joinder and Severance
 
 13
 Mikayelyan, Ivanchikov and Sarkisian argue that the district court erred under Rule 8(b) in denying their motion to sever at the outset of the trial. Alternatively, the defendants argue that the district court erred under Rule 14 by denying their later motion (which was renewed at the end of the trial) to sever the extortion count. A claim of misjoinder of charges under Rule 8(b) is a question of law reviewed de novo. See United States v. Vasquez-Velasco, 15 F.3d 833, 843 (9th Cir. 1994). The district court's denial of a motion to sever under Rule 14 is reviewed for an abuse of discretion. See United States v. Baker, 10 F.3d 1374, 1386 (9th Cir. 1993) (as amended). "The test for abuse of discretion by the district court is whether a joint trial was so manifestly prejudicial as to require the trial judge to exercise his discretion in but one way, by ordering a separate trial." Id. (quotations omitted).
 
 A. Rule 8(b) Improper Joinder
 Rule 8(b) provides:
 
 14
 Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.
 
 
 15
 (Emphasis added). "Under this rule, when multiple defendants are involved, joinder is improper unless all offenses arise out of the same series of acts or transactions." See United States v. Martin, 567 F.2d 849, 853 (9th Cir. 1977). Because "[t]he goal of Rule 8(b) is to maximize trial convenience and efficiency with a minimum of prejudice," United States v. Sanchez-Lopez, 879 F.2d 541, 550 (9th Cir. 1989), "Rule 8(b) is construed liberally in favor of joinder." Baker, 10 F.3d at 1387. In determining whether two or more offenses are part of the "same series of acts or transactions constituting an offense," Fed. R. Crim. P. 8(b), this court looks for a "logical relationship" between the offenses. As this court has explained:[W]e have stated that "transactions" has a flexible meaning and that the existence of a "series" depends upon the degree to which the events are related. Mere factual similarity of events will not suffice. Rather, there must be some greater "logical relationship" between the occurrences. Such a logi cal relationship may be shown by the existence of a common plan, scheme, or conspiracy.
 
 
 16
 United States v. Ford, 632 F.2d 1354, 1371-72 (9th Cir. 1980) (citations omitted), overruled on other grounds , United States v. De Bright, 730 F.2d 1255, 1259 (9th Cir. 1984) (en banc). A "logical relationship" may also be shown if "the common activity constitutes a substantial portion of the proof of the joined charges." Vasquez-Velasco, 15 F.3d at 844 (quotations omitted).
 
 
 17
 The defendants argue that joinder of the count 9 extortion charge with the remaining counts alleging trafficking in stolen cars and auto parts ("car counts") was improper because the two crimes were not "logically related," nor was there a large area of overlapping proof between the joined charges. The government essentially contends that the Glendale extortion trip and the car counts were all part of one big conspiracy consisting of the same members led by Mikayelyan.
 
 
 18
 We hold that the district court erred in joining the extortion and car counts because there is not a sufficient logical relationship between them. This is not an instance where one criminal activity naturally flows from separate criminal conduct. See United States v. Golb, 69 F.3d 1417, 1426 (9th Cir. 1995) ("Obviously the laundering of drug proceeds through the purchase of airplanes to smuggle drugs is logically related to drug smuggling."); Sanchez-Lopez, 879 F.2d at 551 (holding that drug smuggling and transportation of illegal aliens are logically related because "illegal aliens could thwart . . . immigration laws if they can support themselves in this country through the money obtained through [drug smuggling]"); United States v. Patterson, 819 F.2d 1495, 1501 (9th Cir. 1987) (stating that tax evasion and conspiracy to distribute heroin are logically related where unreported income is derived from heroin sales). Nor is this an instance where all the criminal activities logically fall under the umbrella of one big conspiracy. See Ford, 632 F.2d at 1372 (holding various criminal activities were "all part of an ongoing scheme to enrich [union trust fund] trustees at the expense of the trusts").
 
 
 19
 Further, there was no substantial overlap in the evidence presented for the car and extortion counts. See id. at 1372 (holding that joinder under Rule 8(b) of different sets of crimes was not error where evidence submitted to prove one set of crimes was also relevant to the other set); VasquezVelasco, 15 F.3d at 844 (same). The only meaningful connections between the extortion count and the car counts are that some of the same defendants were charged in both counts, and the extortion incident occurred while the car scheme was ongoing. See Golb, 69 F.3d at 1425-26 (stating that a "common cast of characters" and a short period of time between charged transactions both support finding a logical relationship between counts). Still, we conclude that under the circumstances here involved, these factors alone do not support the necessary "logical relationship" between the separate counts. Rather, it seems that during the scheme to steal cars and auto parts, Mikayelyan agreed to commit an unrelated and isolated incident of extortion. We hold that the district court erred in joining the extortion and trafficking counts.
 
 
 20
 This does not end the inquiry, however, because improper joinder is subject to harmless error review. See United States v. Lane, 474 U.S. 438, 449 (1986)."Under Rule 52(a), the harmless-error rule focuses on whether the error affected substantial rights." Id. (quotations omitted). "[A]n error involving misjoinder affects substantial rights and requires reversal only if the misjoinder results in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict." Id. (quotations omitted).
 
 
 21
 We hold that the error in joining the counts was harmless. This court has recognized several sources of prejudice from improperly joined counts. First, prejudice may result if joinder would result from the admission of evidence of other uncharged misconduct. See United States v. Lewis , 787 F.2d 1318, 1322, amended 798 F.2d 1250 (9th Cir. 1986) (recognizing a high risk of undue prejudice where "joinder of counts allows evidence of other crimes to be introduced in a trial of charges with respect to which evidence would otherwise be inadmissible" (quotations omitted)). None of the counts in this case, however, involved the admission of prior bad acts. Second, prejudice may result where defendants with "markedly different degrees of culpability" are jointly tried. Baker, 10 F.3d at 1388 (quotations omitted). Although there was more evidence supporting Mikayelyan's involvement in the scheme than that of either Sarkisian or Ivanchikov, it cannot be said that the difference between their respective culpabilities was so substantial as to unfairly influence the jury's verdict.
 
 
 22
 Ivanchikov alone argues that his trial should have been severed from the remaining defendants because he was not charged in the extortion count. This court has recognized that in
 
 
 23
 a joint trial where one defendant is charged with offenses in which the other defendants did not participate, the detailed evidence introduced to establish guilt of the separate offenses may shift the focus of the trial to the crimes of the single defendant. In such cases, codefendants run a high risk of being found guilty merely by association.
 
 
 24
 United States v. Satterfield, 548 F.2d 1341, 1346 (9th Cir. 1977). Ivanchikov argues that under Satterfield , he was prejudiced because the jury may have found him guilty "merely by association."
 
 
 25
 In Satterfield, the government jointly tried defendants Satterfield and Merriweather despite the fact that Merriweather was charged with five counts of bank robbery, and Satterfield was allegedly involved in only two of those. This court held that Satterfield was prejudiced by the joint trial because "the case against Merriweather for the three robberies committed by him alone was stronger than the case against Satterfield for the [remaining two] robberies." Id. Ivanchikov's reliance on Satterfield is misplaced, however, because in this case, the amount of evidence supporting the extortion count was not materially stronger than the evidence supporting the car counts. Thus, Ivanchikov was not prejudiced by the joint trial.
 
 
 26
 The district court also minimized the risk of prejudice through limiting instructions. Throughout the trial, the court granted defense counsels' requests to instruct the jury when evidence was admissible against fewer than all the defendants. The district court also instructed the jury at the end of the trial:
 
 
 27
 Although the defendants are being tried together you must give separate consideration to each defendant. In doing so you must determine what the evidence in this case shows with respect to each defendant, leaving out of consideration any evidence admitted solely against some other defendants. The fact that you may find one of the defendants guilty or not guilty should not control your verdict as to any other defendants.
 
 
 28
 A separate crime is charged against one or more of the defendants in each count. The charges have been joined for trial. You must decide the case of each defendant on each crime charged against that defendant separately. Your verdict on any count as to any defendant should not control your verdict on any other count or as to any other defendant.
 
 
 29
 We conclude that under the facts involved, such an instruction effectively cured any risk of unfair prejudice presented by the joint trial of the defendants on both the extortion and car counts.
 
 
 30
 In sum, we hold that the joinder of the extortion count and car counts was error, but that the error was harmless.
 
 B. Rule 14 -Motion to Sever
 
 31
 "Rule 14 motions for severance are committed to the sound discretion of the district court." United States v. Abushi, 682 F.2d 1289, 1296 (9th Cir. 1982). The denial of a motion to sever pursuant to Rule 14 will be reversed only for abuse of that discretion. See United States v. Tootick , 952 F.2d 1078, 1080 (9th Cir. 1991). As stated in the previous section, the defendants failed to demonstrate any prejudice from misjoinder. For the same reasons as discussed above, the defendants have failed to demonstrate the "clear, manifest, or undue prejudice" required to justify reversal for the district court's failure to sever. Vasquez-Velasco, 15 F.3d at 846. We hold that the district court did not abuse its discretion in denying the defendants' motion to sever.
 
 II. Voir Dire
 
 32
 The district court is in the best position to make judgments concerning the impartiality and credibility of prospective jurors, see Rosales-Lopez v. United States, 451 U.S. 182, 189 (1981) (plurality opinion), and thus has "considerable control over the scope of questioning permitted during voir dire." United States v. Annigoni, 96 F.3d 1132, 1139 (9th Cir. 1996) (en banc). Accordingly, this court reviews for abuse of discretion the district court's refusal to ask the defendants' requested voir dire questions. See United States v. Goland, 959 F.2d 1449, 1454 (9th Cir. 1992).
 
 
 33
 Because all the defendants were either of Russian or Armenian descent, prior to the commencement of voir dire, Semenov, Ivanchikov, and Mikayelyan requested the district court to ask the prospective jurors numerous and detailed questions about their views and experiences with respect to ethnic Armenians and Russians. The district court denied the defendants' request, but instead asked in open court:
 
 
 34
 The defendants in this matter are from Russia and Armenia, as are some of the witnesses. In connection with deciding this case fairly and impartially, does anyone have any problem with that?
 
 
 35
 No juror raised a hand. The district court then asked this follow-up question:
 
 
 36
 Because of that [sic] some of the witnesses' testimony and that of a defendant, if he testifies, will be given through an interpreter . . . . Now, would any of you be bias or prejudice [sic] against a defendant or any of them because of the use of interpreters during the trial?
 
 
 37
 Again, no juror raised a hand. The district court also asked each individual juror whether, if selected to serve, he or she could think of any reason why he or she could not be a fair and impartial juror. Each juror answered that he or she could not think of such a reason.
 
 
 38
 On appeal, Semenov, Ivanchikov, and Mikayelyan contend that the court erred by failing to adequately question the jurors about any potential ethnic or racial bias that they might have against Armenians and Russians during voir dire. The defendants argue that because "[t]here is a clear link between Gypsies, who are commonly believed to reside in Eastern Europe, and the defendants, all of whom were from Armenia and Russia, two Eastern European countries," [Ivan. Blue Brief at 39] the district court was required to conduct voir dire into ethnic bias.
 
 
 39
 The Supreme Court has held that"[t]here is no constitutional presumption of juror bias for or against members of any particular racial or ethnic groups." Rosales-Lopez, 451 U.S. at 190. Still, where issues of racial prejudice are" `inextricably bound up with the conduct of the trial,' " the Sixth Amendment guarantee of an impartial jury does require a district court not to refuse a defendant's request for voir dire on racial prejudice. Id. at 189 (quoting Ristaino v. Ross, 424 U.S. 589, 597 (1976)). In this case, the charges against the defendants did not raise any issues involving racial or ethnic prejudice. See, e.g., Ham v. South Carolina, 409 U.S. 524, 526 (1973) (issues of racial prejudice raised where the defendant, who was Black, was charged with a drug offense, but claimed that the local police had framed him for his civil rights activities). Thus, there were no "special circumstances" raising a constitutional Sixth Amendment issue in this case. See Rosales Lopez, 451 U.S. at 192.
 
 
 40
 Nevertheless, a district court may abuse its discretion in denying a defendant's requested voir dire if there exists a "reasonable possibility that racial or ethnic prejudice might have influenced the jury." Rosales-Lopez, 451 U.S. at 191. The Supreme Court suggested that such a situation may arise where the defendant is "accused of a violent crime and where the defendant and the victim are members of different racial or ethnic groups," id. at 192, or where "the external circumstances of the case indicate a reasonable possibility that racial or ethnic prejudice will influence the jury's evaluation of the evidence." Id. at 192-93. The first situation is not applicable here because the charged violations of the Motor Vehicle Theft Prevention Act are not violent crimes, and the victim of the alleged extortion attempt, a violent crime, was also of Armenian descent.
 
 
 41
 The facts of this case also do not support the second situation, because there was not a reasonable possibility that racial or ethnic prejudice might have influenced the jury. There was no evidence that the jurors were likely to connect the defendants with "gypsies" from Eastern Europe.[2] The district court also took adequate precautions to ensure that the jurors could serve impartially. The district court assured itself that no jurors had a problem with the fact that the defendants and some witnesses were from Armenia and Russia, and that no juror held any biases because interpreters would be used. Further, the district court asked all the prospective jurors whether, if selected to serve, they could think of any reason why they could not be fair and impartial. The Supreme Court has held that such questions reduce the possibility of ethnic prejudice. See Rosales-Lopez, 451 U.S. at 193 n.8. The only factor relied upon by the defendants is that the jurors learned that the defendants were from Armenia and Russia, and the conjecture that the jury may have held biases against people of those ethnic backgrounds.
 
 
 42
 Even assuming there was a reasonable possibility that racial or ethnic prejudice might have influenced the jury, the district court's questions regarding the defendants' ethnicity, the use of interpreters, and the jurors' abilities to serve impartially, were all reasonably sufficient to test the jury for bias and partiality. See United States v. Giese, 597 F.2d 1170, 1182-83 (9th Cir. 1979) ("A district court has considerable discretion to accept or reject proposed questions . . ., and as long as it conducts an adequate voir dire, its rejection of a defendant's specific questions is not error.").
 
 
 43
 We hold that the district court did not err in refusing the defendants' requested voir dire questions. Alternatively, we hold that the district court's questions adequately tested the prospective jurors for bias against Armenians and Russians.
 
 III. Prejudicial Juror Statement
 
 44
 Semenov, Ivanchikov, and Mikayelyan all argue that the district court erred in denying their motion for a mistrial because the jury was tainted by Juror Angela Yerkes's prejudicial statement against "gypsies." Alternatively, they argue that a mistrial should have been ordered because Juror Yerkes thought that she had received a threat in connection with the case, and had expressed that view to the other jurors.
 
 A. Juror Angela Yerkes
 
 45
 On February 23, 1998, Juror Angela Yerkes stated that she had a problem. In a meeting in chambers, Yerkes explained that over the past weekend some unknown person had called the police and told them that Yerkes's son had killed her. Yerkes was apparently very upset over the incident. The district court then questioned Yerkes to better understand what had happened. The following exchange then occurred:
 
 
 46
 Yerkes: When you first asked the questions do you have any problem with serving on this jury I didn't understand or didn't know what the case was. In our business that I worked for for many years we do not allow gypsies into our business because they wreak havoc and whatnot.
 
 
 47
 * * *
 
 
 48
 The Court: I don't understand what you mean by gypsies.
 
 
 49
 Yerkes: I made the mistake of asking them where they are from, and they said, "We are gypsies. We are from anywhere." They have had bad luck, and I'm not sure that I can honestly give an opinion understanding that they are -the defendants in this case are gypsies.
 
 
 50
 The judge continued to question Yerkes about the incident, but Yerkes, who became more upset as time went on, had difficulty answering his questions. Unable to gather any more information from Yerkes, the judge excused her. After further, discussion, the court and all counsel agreed to hold individual in camera meetings with each juror to determine what Yerkes may have told them.
 
 
 51
 The in camera meetings revealed the following: (1) Yerkes asked the jury whether anyone had anything strange happen to them over the previous weekend; (2) Yerkes told the other jurors, in some detail, the story of the phone call and the police's visit to her son; (3) after some jurors thought that there might be a connection between the phone call and the district court's excusing another juror,[3] Yerkes became upset; and (4) the jurors then advised Yerkes to inform the judge, which Yerkes ultimately did. Significantly, Jurors 10 and 11 told the district court judge that Yerkes had said something about gypsies. Neither juror, however, understood what she meant.[4]
 
 
 52
 The judge told each juror that the Yerkes incident had nothing to do with the reason why Juror Barnello was excused, and that the Yerkes incident was the result of a "childish prank." The judge asked the jurors whether Yerkes's story would impair their ability to be fair and impartial. All of the jurors answered that the Yerkes incident would not affect their ability to serve, and that they could continue the case.
 
 
 53
 One defense counsel alleged that after the Yerkes incident, there was a "noticeable change in the relationship" between the jurors and defense counsel. Counsel also alleged that later, during closing arguments, one of the defendants overheard a juror say to another: "I'm still afraid."
 
 
 54
 B. Whether the Jury was Tainted Against the Defendants Because They Might Confuse Them With Gypsies
 
 
 55
 This court reviews for an abuse of discretion the district court's denial of a motion for mistrial. United States v. Randall, 162 F.3d 557, 559 (9th Cir. 1998), cert. denied, 119 S. Ct. 1480 (1999). This court accords "substantial weight" to the district court's assessment of the effect of extraneous information on the jury. United States v. LaFleur, 971 F.2d 200, 206 (9th Cir. 1991) (as amended). The "determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge." Ristaino v. Ross, 424 U.S. 589, 595 (1976) (quotations omitted). The Sixth Amendment right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial,`indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722 (1961). Thus, the defendants' Sixth Amendment rights are violated even if only one juror was unduly biased or improperly influenced. See United States v. Keating, 147 F.3d 895, 903 (9th Cir. 1998) (citing Dickson v. Sullivan, 849 F.2d 403, 408 (9th Cir. 1988)).
 
 
 56
 The issue for this court is whether the jurors' exposure to Juror Yerkes's comments about gypsies "so affected the jury's ability to consider the totality of the evidence fairly that it tainted the verdict." United States v. Smith, 962 F.2d 923, 935 (9th Cir. 1992).[5] Here, the district court took sufficient steps to ensure that the jurors were not prejudiced by Yerkes's statement about gypsies. In individual in camera meetings, the district court questioned each juror on exactly what Yerkes had told them about the incident, and whether they would be able to continue as impartial members of the jury. The court also individually informed nine out of the twelve jurors that the Yerkes incident had nothing to do with the excusing of Juror Barnello.[6] Then, in open court, the district court explained to the jurors that the Yerkes incident had absolutely nothing to do with the trial, but was the result of a childish prank.
 
 
 57
 There was no evidence in the case suggesting that the defendants were gypsies, and none of the jurors gave any indication of thinking that the defendants may be gypsies. In fact, although two jurors did mention Yerkes's "gypsy" comment, they both thought that it was so obscure that none of these jurors could understand it. In denying the defendants' joint motion for a mistrial, the court stated that "based on meeting with each of the jurors for the few minutes I did as to each of the interviews, I am 110 percent satisfied that we have an unbiased, unprejudiced jury." This court has held that "[w]hen a wise and experienced judge, who presided at the trial and observed the jury, comes to such a conclusion, it is not for us to upset it. The trial judge was in a better position than we are to determine whether what happened was prejudicial." United States v. Armstrong, 909 F.2d 1238, 1244 (9th Cir. 1990) (as amended) (quotations omitted) (affirming district court's finding that juror misconduct did not affect the defendant's right to a fair trial).
 
 
 58
 Given the lack of evidence that the jurors would confuse the defendants with gypsies and the obscurity of the "gypsies" comment, we hold that comment did not affect the jury's ability to consider the totality of the evidence fairly or taint the verdict.
 
 C. Threat or Perceived Threat
 
 59
 The defendants also argue that because Yerkes received a threat, or at least perceived that she received a threat, their motion for a mistrial should have been granted. This argument has no merit. First, the district court expressly found that none of the jurors believed that the prank phone call constituted a threat. See United States v. Sublet, 644 F.2d 737, 740 (8th Cir. 1981) (no prejudice where juror received threatening comment from trial spectators and then communicated threat to other jurors, but during hearing held by district court, other jurors explained that they did not perceive comment as a threat). Second, even if any of the jurors did construe the Yerkes incident as a "threat" to her, the district court adequately dispelled any prejudice by telling the jurors in open court that the phone call was a prank, and by individually questioning the jurors to make sure that they could proceed impartially. See United States v. Angulo , 4 F.3d 843, 847-48 (9th Cir. 1993) (court may rebut presumption of prejudice by holding a hearing to examine the effect of threat on the remaining jurors); see also United States v. Norton, 700 F.2d 1072, 1076 (6th Cir. 1983) (affirming denial of motion for mistrial after juror received a threatening phone call, and then related the call to other jurors, but where judge "carefully questioned all of the exposed jurors as to the effect of the phone call on their ability to remain impartial[, and a]ll of them responded that they were not intimidated, having viewed the call as a harmless prank"); Sublet, 644 F.2d at 741 (affirming denial of motion for mistrial after juror received threatening comment and communicated to four other jurors, but where jurors did not perceive comment as a threat and judge issued curative instruction).
 
 
 60
 We hold that Yerkes' statement about gypsies did not taint the jury, and that the threat or perceived threat arising out of the Yerkes incident was not prejudicial. Thus, we hold that the district court did not abuse its discretion in denying the defendants' motion for a mistrial.
 
 
 61
 IV. Sufficiency of the Evidence Underlying the Extortion Count
 
 
 62
 At the close of the government's case, and again at the close of the evidence, Mikayelyan and Semenov moved for a judgment of acquittal on the extortion count based on insufficiency of the evidence. The district court denied the defendant's motions for judgment of acquittal and Mikayelyan's motion for a new trial, but granted a new trial to Semenov on an unrelated issue. Semenov and Mikayelyan contend that the district court erred in denying their motions for judgment of acquittal.
 
 A. Semenov's Interlocutory Appeal
 
 63
 Before reaching the merits of this issue, we must first consider whether we have jurisdiction to entertain Semenov's claim challenging the sufficiency of the evidence underlying his conviction on the extortion count. The district court granted Semenov a new trial on the extortion count, but Semenov asks this court to review his claim that the evidence underlying his conviction was insufficient. He argues that allowing the government to retry him on this count would violate the Double Jeopardy Clause, and that his only opportunity to raise the insufficiency of evidence claim is in the present appeal. In response, the government argues this claim is not colorable because Semenov's original jeopardy has not yet terminated.
 
 
 64
 A claim of double jeopardy must be at least "colorable" to confer interlocutory jurisdiction on an appellate court. Richardson v. United States, 468 U.S. 317, 322 (1984). To be colorable, a claim must have some possible validity. See id. at 326. Because we rejected the identical double jeopardy claim Semenov raises here in United States v. GutierrezZamarano, 23 F.3d 235 (9th Cir. 1994), we conclude that Semenov has not raised a colorable claim, and we lack jurisdiction to reach the merits.
 
 
 65
 In Gutierrez-Zamarano, the defendant was convicted by a jury of attempted possession of cocaine with intent to distribute. See id. at 236. The district court denied the defendant's post-trial motion for acquittal based on insufficiency of the evidence, but granted the defendant's motion for a new trial on another ground. See id. at 237. On appeal, this court held that a retrial on the defendant's cocaine charge would not violate double jeopardy because the defendant's original jeopardy had not terminated. See id. at 238. The court explained that
 
 
 66
 there has been no event terminating Appellant's original jeopardy. Appellant certainly has not been acquitted. The jury convicted him on the attempt count and the district court found the evidence sup porting this conviction sufficient when it denied his post-trial motion for acquittal . . . . Appellant is thus faced with the unreversed determination by the jury that the prosecution has met its burden of proof.
 
 
 67
 Id. Given that jeopardy had not yet terminated, the court held that the defendant's "retrial will not violate the Double Jeopardy Clause regardless of the sufficiency of the evidence at the first trial." Id.; see also Keating, 147 F.3d at 904 n.6 ("When Keating is retried, his double jeopardy rights will not be implicated regardless of the sufficiency of the evidence at the first trial . . . because Keating's original jeopardy has not terminated." (citation omitted)); United States v. McAleer, 138 F.3d 852, 857 (10th Cir. 1998); United States v. Ganos, 961 F.2d 1284, 1285 (7th Cir. 1992) (per curiam) (court of appeals lacks jurisdiction to review defendant's claim of insufficient evidence where district court grants a new trial). The same holds true for Semenov's claim in this case. Because the district court granted Semenov a new trial, his original jeopardy with respect to the extortion conviction has not yet terminated, and thus retrial on that count does not violate double jeopardy.
 
 B. Sufficiency of the Evidence
 
 68
 Because Mikayelyan was not granted a new trial, we do have jurisdiction to reach the merits of Mikayelyan's sufficiency of the evidence claim. The relevant portion of 18 U.S.C. S 894(a) provides:
 
 
 69
 (a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means
 
 
 70
 (1) to collect or attempt to collect any extension of credit, or
 
 
 71
 (2) to punish any person for the non-re-payment thereof, shall be fined . . . or imprisoned not more than 20 years, or both.
 
 
 72
 (Emphasis added.) An "extension of credit" is a defined term:
 
 
 73
 To extend credit means [(1)] to make or renew any loan, or [(2)] to enter intoany agreement, tacit or express, whereby the repayment or satisfaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred.
 
 
 74
 18 U.S.C. S 891(1). This court has recognized that the statute has "a broad sweep," and reflects Congress' desire to craft a flexible " `weapon to be used with vigor and imagination against every activity of organized crime that falls within its terms.' " United States v. Andrino, 501 F.2d 1373, 1377 (9th Cir. 1974) (quoting H.R. Conf. Rep. No. 1397, 90th Cong., 2d Sess. 31, reprinted in 2 U.S.C.C.A.N. 2029 (1968)).
 
 
 75
 Because this case does not involve an express loan, the second part of the definition of "extension of credit" applies. Thus, the government was required to prove that (1) there was a debt or claim; and (2) there was a tacit or express agreement by the creditor to defer the payment of the debt or claim. Mikayelyan argues that the government did not prove the existence of an "extension of credit" because the government offered no evidence that the creditor, Pogosian, either tacitly or expressly agreed to defer repayment of the debt. The district court found that the evidence was sufficient and denied Mikayelyan's motion for judgment of acquittal.
 
 
 76
 This court reviews de novo the district court's denial of a Rule 29 motion for acquittal. See United States v. Tubiolo, 134 F.3d 989, 991 (9th Cir. 1998). The district court's interpretation of a criminal statute and the scope of the conduct covered by the statute is a question of law reviewed de novo. See United States v. Ripinsky, 20 F.3d 359, 361 (9th Cir. 1994). This court must review the evidence presented against the defendant in the light most favorable to the government to determine whether " `any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " Tubiolo, 134 F.3d at 991 (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).
 
 
 77
 This court has found an extension of credit where the creditor-defendant agrees to hold a bad check until sufficient funds are deposited, see United States v. Lopez , 803 F.2d 969, 975 (9th Cir. 1986), or where the creditor-defendant agrees to repayment of the debt through installments, and uses extortionate measures only after the payments stop. See United States v. Stauffer, 922 F.2d 508, 513 (9th Cir. 1990). This court also found an extension of credit where the creditor defendant relied on the debtor's "repeated assurances" that the debt would be paid, and the defendant used extortionate measures only after the debt was not paid. See United States v. Bonanno, 467 F.2d 14, 15-16, 17 (9th Cir. 1972). Finally, in Andrino, this court found an extension of credit where the victims lost money to the creditor-defendant in a card game, payment was not demanded until next day, and threats and violence were used until the victims paid. See 501 F.2d at 1375-76, 1378.
 
 
 78
 Under the reasoning of those cases, there was sufficient evidence underlying Mikayelyan's conviction under section 894. As the district court found in denying Mikayelyan's Rule 29 motion, there were several pieces of evidence from which the jury could have inferred a tacit agreement by the creditor, Pogosian, to defer repayment of the claim. First, the victim, Karapogosian, testified that he had several conversations about the debt prior to 1996, but the band of men assembled by Mikayelyan to collect the debt did not visit Karapogosian until February 1996. Second, at that February 1996 meeting, Mikayelyan suggested to Karapogosian that he call Pogosian and talk to Pogosian about repaying the debt. Third, one of the defendants told Karapogosian that Karapogosian had a debt to pay, that he did not care how Karapogosian got the money, and asked Karapogosian "when " he was going to get the money. Fourth, one of the defendants told Karapogosian that if he did not pay, a "bad thing " was going to happen to him. Fifth, Gabareyev testified that the purpose of the February 1996 meeting was only to "scare " Karapogosian into paying the debt. Finally, Sarkisian told Karapogosian that he should call a family member about putting together the money. Given this evidence, there was sufficient evidence for the jury to find an agreement to defer payment.
 
 
 79
 In sum, we hold that the district court did not err in denying Mikayelyan's motion for judgment of acquittal based on insufficient evidence. We further hold that Semenov's sufficiency of the evidence claim is not colorable on this appeal because he was granted a new trial by the district court.[7]
 
 
 80
 V. Sufficiency of the Evidence Underlying the Conspiracy Count
 
 
 81
 Sarkisian argues that the evidence was insufficient to link him to the car stealing conspiracy and underlying substantive crimes. "Once the existence of a conspiracy is established, evidence of only a slight connection to the conspiracy is necessary to support a conviction of knowing participation in that conspiracy." United States v. Ramos-Rascon, 8 F.3d 704, 707 (9th Cir. 1993) (emphasis added) (quotations omitted).
 
 
 82
 Sarkisian does not dispute that his co-defendants were engaged in a conspiracy to steal cars and auto parts; rather he argues that the evidence was insufficient to link him to that conspiracy. In response, the government offers several pieces of evidence it argues support Sarkisian's link to the conspiracy. Viewing the evidence in the light most favorable to the government, we hold that the evidence linking Sarkisian to the conspiracy was sufficient.
 
 
 83
 First, Bedrik testified about numerous connections between Mikayelyan and Sarkisian. Bedrik recounted a meeting where Mikayelyan was dismayed with Ivanchikov, and was going to make Sarkisian his "right hand" man. Bedrik testified that Sarkisian translated a meeting between Semenov, Mikayelyan and Ivanchikov, in which Semenov and Mikayelyan complained about Ivanchikov overcharging customers on certain auto parts. Bedrik also testified that on occasions, Sarkisian and Mikayelyan had approached him about stealing cars that they needed. Bedrik recounted a specific instance where Sarkisian approached him about stealing a Subaru because Sarkisian needed parts from that make of car. Second, pen registers recorded several hundred phone calls between Sarkisian and Mikayelyan.
 
 
 84
 Finally, the evidence concerning a plum-colored Honda supports Sarkisian's connection to the conspiracy. Testimony established that on February 5, 1996, Sarkisian purchased a salvaged Honda from a dealer at an auction. Three days later, a plum-colored Honda was stolen by an unknown person from a neighborhood in Sacramento.Pen register records showed that the day after the plum-colored Honda was stolen, Ivanchikov called Sarkisian for the first time in seven months. Gabareyev testified that later, while he was at Sarkisian's house, either Sarkisian or Semenov told him that Sarkisian had "VIN-switched" a car and given it to his sister. That car was later tracked down and confirmed to be a plum-colored Honda that had been VIN-switched. The evidence underlying the plum-colored Honda supports the inference that: (1) Sarkisian purchased a salvaged Honda and was ready to perform a VIN-switch on another Honda; (2) members of Mikayelyan's conspiracy stole the Honda from Sacramento; and (3) Ivanchikov called Sarkisian to tell him that the car was ready; (4) Sarkisian performed a VIN switch on the car and gave it to his sister.
 
 
 85
 We hold that the evidence linking Sarkisian to the conspiracy was sufficient.
 
 VI. Search of Storage Room
 
 86
 The district court denied Ivanchikov's and Mikayelyan's motions to suppress the fruits of a search of the storage room, finding that both defendants lacked standing to challenge the legality of the search. Whether a defendant has standing to contest the legality of a search presents a mixed question of fact and law. See United States v. Singleton, 987 F.2d 1444, 1447 (9th Cir. 1993). This court reviews de novo the district court's ultimate legal conclusion, while its findings of facts are reviewed for clear error. See United States v. Armenta, 69 F.3d 304, 307 (9th Cir. 1995).
 
 
 87
 The district court found that the storage room was rented by Bedrik's grandmother, but that the rental agreement listed Ivanchikov and Mikayelyan as persons allowed access to the storage room. The district court further found that neither Ivanchikov nor Mikayelyan claimed any interest in any of the items seized from the locker, and that neither defendant was present at the storage room at the time of its search. Under these circumstances, the district court concluded that Ivanchikov and Mikayelyan lacked standing to challenge the search of the storage room.
 
 
 88
 To establish standing to challenge the legality of a search or seizure, the defendants must demonstrate that they have a "legitimate expectation of privacy" in the items seized or the area searched. United States v. Padilla , 508 U.S. 77, 82 (1993) (per curiam) ("Padilla I"); see also Rakas v. Illinois, 439 U.S. 128, 143-44 (1978). To demonstrate this, the defendants must manifest a subjective expectation of privacy in the area searched, and their expectation must be one that society would recognize as objectively reasonable. See United States v. Echegoyen, 799 F.2d 1271, 1277 (9th Cir. 1986) (citing Smith v. Maryland, 442 U.S. 735, 740 (1979)). The defendants have the burden of establishing that, under the totality of the circumstances, the search or seizure violated their legitimate expectation of privacy in the storage room. See Rawlings v. Kentucky, 448 U.S. 98, 104 (1980); United States v. Kovac, 795 F.2d 1509, 1510 (9th Cir. 1986).
 
 
 89
 We hold that Ivanchikov and Mikayelyan lack Fourth Amendment standing to challenge the search of the storage room. It is true that Ivanchikov and Mikayelyan were listed on the rental agreement as people who possessed the right to access the storage room, and that the storage room was locked. Still, we believe that this connection alone is insufficient to establish a reasonable expectation of privacy in the room. Underlying our analysis is the recognition that the defendants' expectation of privacy in a commercial storage area is lower than that in a residential area. See Minnesota v. Carter, 119 S. Ct. 469, 474 (1998) ("[p]roperty used for commercial purposes is treated differentlyfor Fourth Amendment purposes than residential property"); New York v. Burger, 482 U.S. 691, 700 (1987) (the "expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home").
 
 
 90
 Neither Mikayelyan nor Ivanchikov claimed any interest in any of the items seized during the search, and the district court found that neither defendant demonstrated that either of them "had ever stored materials in, or otherwise utilized, the storage locker." We note that though the failure to allege ownership of the items seized, by itself, could not bar standing to challenge the search, it is a factor to be considered. See United States v. Davis, 932 F.2d 752, 757 (9th Cir. 1991) (as amended) (defendant had standing to challenge search of an apartment where, among other things, defendant stored items there in a locked safe); see also United States v. Chaves, 169 F.3d 687, 691 (11th Cir. 1999) (defendant had standing to challenge search of warehouse he did not rent, where defendant possessed the only key to the warehouse and stored personal and business papers there); United States v. Fields, 113 F.3d 313, 320 (2d Cir. 1997) (defendant had standing to challenge search of an apartment where, among other factors, defendant made use of apartment on 40 or 50 occasions); United States v. Aguirre, 839 F.2d 854, 859 (1st Cir. 1988) (defendant lacked standing to challenge search of an apartment where, among other things, defendant denied any interest in the items seized and there was no proof of former usage). Further, there was no evidence that Ivanchikov or Mikayelyan paid any part of the rental fee for the storage room. See Davis, 932 F.2d at 757 ("It is also significant that [the defendant] paid at least a portion of the rent for [the] apartment. Having assumed an ongoing obligation to pay the rent, [the defendant] exercised partial or joint control over the premises."); United States v. Johns, 851 F.2d 1131, 1135-36 (9th Cir. 1988) (defendant had standing to challenge search of warehouse where he paid part of the rent and was co-owner of items found, even though his name did not appear on the lease); United States v. Rettig, 589 F.2d 418, 423 (9th Cir. 1978) (as amended) (fact that defendant paid portion of rent, had key, unlimited access, and stayed there when in state, sufficient to confer standing to challenge search, even though defendant lived elsewhere); see also Fields, 113 F.3d at 320 (defendant had standing to challenge search of an apartment where, among other factors, defendant paid $125 a week to use the apartment); United States v. Brazel, 102 F.3d 1120, 1148 (11th Cir. 1997) (defendant lacks standing to challenge search of an apartment where another person leased the apartment and paid the rent and defendant presented no evidence that he had ever lived there).
 
 
 91
 Under the totality of these circumstances, Ivanchikov and Mikayelyan have failed to make a sufficient showing that they possessed a legitimate expectation of privacy in the storage room. We hold that a defendant who merely possesses the authority to access a storage rental room but does not use it, without more, lacks Fourth Amendment standing to challenge the unlawful search of that area. Cf. United States v. Anderson, 154 F.3d 1225, 1230 (10th Cir. 1998), cert. denied, 119 S. Ct. 2048 (1999) ("a corporate employee does not have standing to challenge the search of corporate offices not his own or other property merely because the employee has access to or control over certain areas"); Aguirre, 839 F.2d at 859 (defendant lacked standing to challenge search of an apartment where the defendant was not the lessor, presented no proof of former usage, denied any interest in the items seized, and there was no evidence of efforts to exclude others from enjoyment of the property, or of an ability to restrict access); United States v. Baron-Mantilla, 743 F.2d 868, 870 (11th Cir. 1984) (per curiam) (mere possession of a key to thepremises searched is insufficient to confer standing).
 
 VII. Prosecutorial Misconduct
 
 92
 Semenov and Mikayelyan argue that the government committed misconduct at several points during the trial. Specifically, they allege that the prosecutor elicited inadmissible hearsay testimony and irrelevant evidence, and vouched for the government's case during her closing argument.
 
 
 93
 This court reviews for an abuse of discretion a district court's rulings on objections to alleged prosecutorial misconduct. See United States v. Etsitty, 130 F.3d 420, 424 (9th Cir. 1997) (per curiam), amended in part on other grounds, 140 F.3d 1274 (9th Cir.), cert. denied, 117 S. Ct. 515 (1998); United States v. Santiago, 46 F.3d 885, 892 (9th Cir. 1995). To obtain relief, the defendants must show that it is " `more probable than not that the misconduct materially affected the verdict.' " United States v. Peterson, 140 F.3d 819, 821 (9th Cir. 1998) (quoting United States v. Hinton, 31 F.3d 817, 824 (9th Cir. 1994)). The prosecution's alleged misconduct cannot be viewed in a vacuum, but must be viewed in the context of the entire trial. See Hinton, 31 F.3d at 824.
 
 A. Inadmissible Evidence
 
 94
 The first alleged incident of misconduct occurred when the prosecutor asked Detective Doroshov on direct examination why he had gone to Mikayelyan's repair shop on the day it was raided. Doroshov's answer contained a hearsay statement by Gabareyev. The district court immediately sustained the defense objection and struck Doroshov's answer.
 
 
 95
 The prosecutor's question in this instance simply did not reach the level of prosecutorial misconduct. On its face, the question was not phrased to elicit improper hearsay evidence. See Etsitty, 130 F.3d at 424 (no prosecutorial misconduct where "[n]othing in the questioning or the answers given can be construed to reflect an intention by the prosecutor to mislead the jury"). In fact, it seemed as if it was Doroshov who had some difficulty answering the prosecutor's questions without relying on hearsay, even prompting the district court to warn Doroshov: "Objections are being made because it's hearsay, what [Gabareyev] may have told you. Can you answer the question without telling us what the cooperating witness said to you?" In any event, even if the prosecutor's question was error, the defendants fail to show that they were prejudiced because the district court sustained the defendant's objection and struck the answer, and then instructed the jury not to consider hearsay statements for their truth. See United States v. Tham, 665 F.2d 855, 861 (9th Cir. 1981) (as amended) (holding that prosecutor's improper question did not affect verdict where objection was sustained and limiting instruction given); see also Turner v. Marshall , 63 F.3d 807, 818 (9th Cir. 1995) ("In this instance, there was no denial of a fair trial because the judge actually sustained objections to leading questions.").
 
 
 96
 Semenov and Mikayelyan argue that the prosecutor again tried to elicit hearsay testimony from Doroshov during her redirect examination.[8] This time, the prosecutor's question did ask for a hearsay answer. The defense objection was sustained. The answer was not struck, however, because no request was made. Again, even assuming that this question was improper, the defendants have failed to demonstrate that it is "more probable than not that the misconduct materiallyaffected the verdict." Peterson, 140 F.3d at 821 (quotations omitted). Given that the district court sustained the objection, coupled with the district court's earlier instruction to the jury not to consider hearsay for its truth, if there was any error, it was harmless.
 
 
 97
 The third incident raised by the defendants involved the prosecutor's attempt to elicit Detective Doroshov's reasons for not arresting Gabareyev, in an apparent attempt to bolster Gabareyev's credibility. On cross-examination of Doroshov, the defense had shown that the government failed to arrest Gabareyev despite his committing several crimes and not following Doroshov's directions. On redirect, the government sought to repair that damage by showing that it was more important to keep Gabareyev as an informant than to arrest him. The district court at least partially agreed that this point was relevant, and allowed the prosecution to show that Gabareyev was not immediately arrested because of his value as an informant. The court did not, however, allow the prosecution to explain in more detail the reasons why Gabareyev was important. Because the prosecutor's questions addressed an issue raised by the cross-examination, there was no misconduct. See Hinton, 31 F.3d at 824 (holding that there is no prosecutorial misconduct in offering admissible evidence); see also United States v. Chu, 5 F.3d 1244, 1251 (9th Cir. 1993) (holding that there is no prosecutorial misconduct where prosecutor seeks to clarify on redirect examination issues muddied by the defense counsel on cross-examination).
 
 
 98
 Again, even if the prosecutor's strategy was improper, there was no prejudice. The district court sustained all of the defendants' objections before Doroshov could testify in detail to the reasons why Gabareyev was not arrested. See Hinton, 31 F.3d at 825 (holding defendant suffered no prejudice where court sustained objection before witness could respond).
 
 B. Vouching
 
 99
 Finally, Semenov and Mikayelyan allege that the prosecutor committed misconduct during her closing argument. During closing argument on behalf of Bugriev, defense counsel attacked the credibility of Bedrik, a government witness, by implying that Bedrik manufactured evidence against Bugriev at the request of the government:
 
 
 100
 So they interview Bedrik during trial. Probably his 15 minutes of fame and glory, his testimony to you from the witness stand. Maybe they whined to him a little bit about the fact that they don't have any thing on Bugriev. So like a knight in shining armor it's Bedrik to the rescue.
 
 
 101
 In her rebuttal closing argument, the prosecutor stated:
 
 
 102
 And somebody in the defense group said that the Government . . . whined to Mr. Bedrik that they didn't have enough evidence on Mr. Bugriev, and he had to help them out.
 
 
 103
 Not only have you seen the witnesses on the stand day after day, but you've seen the lawyers in the courtroom day after day. Do you really think Mr. Bender [the other prosecutor] or myself would have such a conversation with a witness?
 
 
 104
 The defense objection was overruled. The defendants argue that this statement constituted improper vouching because it asked the jury to rely on the credibility of prosecutors to reject testimony favorable to the defense.
 
 
 105
 "Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." United States v. Necoechea, 986 F.2d 1273, 1276 (9th Cir. 1993) (as amended); see also United States v. Young, 470 U.S. 1, 18-19 (1985). In this case, the prosecutor's statement asked the jury to rely on her credibility, and consequently on the prestige of the United States, in suggesting that Bedrik was telling the truth. This statement, however, was an "invited reply" to defense counsel's argument that Bedrik manufactured evidence against Bugriev. See United States v. Sayetsitty, 107 F.3d 1405, 1409 (9th Cir.1997) (prosecution's closing argument that defense counsel's characterization of government's investigation as a "web of deception" was untrue, was an "invited reply" to defense's argument); United States v. Lopez-Alvarez, 970 F.2d 583, 598 (9th Cir. 1992) ("Most of the comments challenged by Lopez-Alvarez were made in response to comments made by the defendant's counsel.").
 
 
 106
 Nevertheless, the prosecution is not allowed to use improper tactics even in response to similar tactics by the defense. See United States v. McKoy, 771 F.2d 1207, 1212 (9th Cir. 1985). But even if the prosecutor's statement was improper vouching, we will reverse only if the error was not harmless. See United States v. Edwards, 154 F.3d 915, 923 (9th Cir. 1998); In applying a harmless error analysis, this court must determine whether it is more probable than not that the prosecutor's conduct materially affected the fairness of the trial. See Edwards, 154 F.3d at 923; McKoy, 771 F.2d at 1212. In this case, though the prosecutor's remark was vouching, it was harmless. First, the relevant portion of Bedrik's testimony (alleging that Bedrik had witnessed Bugriev stealing a Honda) was offered specifically against Bugriev, and thus was not directly relevant to the guilt of Semenov or Mikayelyan. Second, Bugriev's involvement in the conspiracy was corroborated by Officer Chris Rogers, who arrested Bugriev after finding him in the process of stealing another Honda. Thus, neither Semenov nor Mikayelyan were harmed.
 
 
 107
 We hold that the prosecutor's statement was an invited reply to defense counsel's attack on Bedrik's credibility, and that although the statement was vouching, it was harmless.
 
 VIII. Sentencing Errors
 
 108
 Mikayelyan argues that the district court erred in applying enhancements under U.S.S.G. SS 2E2.1(b)(1)(C) & 3B1.1(b). This court reviews for clear error the district court's factual findings. See United States v. Ladum, 141 F.3d 1328, 1344 (9th Cir.) cert. denied, 119 S. Ct. 225 (1998). The district court's interpretation of the Guidelines is reviewed de novo. See United States v. Bailey, 139 F.3d 667, 667 (9th Cir. 1998).
 
 A. U.S.S.G. S 2E2.1(b)(1)(C)
 
 109
 At the sentencing hearing, the district court found that it was "[m]ore likely than not . . . Mikayelyan suggested to the group that he was consenting that a gun be used in[the Glendale] extortion attempt but that the details would be supplied later by Bekaryn." The district court then adopted the recommendation of the presentence report (PSR) and applied a 3level enhancement under U.S.S.G. S 2E2.1(b)(1)(C), which provides that in an extortionate collection of credit charge, "if a dangerous weapon (including a firearm) was brandished, displayed or possessed, increase by 3 levels." Mikayelyan argues that the district court erred because it was not reasonably foreseeable to him that members of the Glendale extortion team would brandish guns during the visit.
 
 
 110
 "[T]here is no presumption of foresee ability, and the burden of proving foresee ability remains on the government." United States v. Castaneda, 9 F.3d 761, 767 (9th Cir. 1993) (as amended) (citations omitted); see also United States v. Torres, 81 F.3d 900, 903 (9th Cir. 1996) (holding that the government's burden of proving factors enhancing a sentence is by a preponderance of the evidence). Further, it is clear that the district court's factual determination of foresee ability "must be supported by the particular facts and circumstances of the underlying [offense]." United States v. Zelaya, 114 F.3d 869, 872 (9th Cir. 1997).
 
 
 111
 The district court did not clearly err in finding that Mikayelyan should have reasonably foreseen that guns would be brandished in the extortion attempt. The district court relied on several statements made by Gabareyev to Detective Doroshov, as reported in Doroshov's log in applying the adjustment. In the first entry, Doroshov wrote on February 1, 1996:
 
 
 112
 [Gabareyev] told me that he has been spending time with [Ivanchikov, Semenov, and Yuri Penkov]. He told me that the three were talking about going to Los Angeles and demanding money from an Armanian [sic] Man and threatening him with a gun. [Gabareyev] stated that Yuri has a stolen gun that came out of a stolen vehicle from the Sacramento area. Yuri keeps the gun at a friend's house. [Gabareyev] described the gun as a 9 mm and stated it was the one they would use for the extortion attempt.
 
 
 113
 Thus, Gabareyev was talking about the use of a gun eleven days before the extortion attempt, and it was reasonable for the district court to conclude that Mikayelyan was aware of Gabareyev's plan to use a gun, and consented to that plan. Further, Mikayelyan admitted to Detective Doroshov in a post-arrest interview that he was the one Bekaryn contacted about the proposed extortion attempt, and that he had personally arranged for several members of his auto-stealing scheme to carry out the attempt. Mikayelyan's close supervision and involvement in the extortion scheme supports a finding that he also instructed how the victim was to be intimidated--i.e., with guns. Finally, the fact that Mikayelyan knew very well Bekaryn and the other members of the extortion team lends support that he knew how they would operate, and that guns foreseeably would be used. See United States v. Willis, 899 F.2d 873, 875 (9th Cir. 1990) (holding that where coconspirators are few and know one another well, the court may infer that each knew the others' method of operation). Also, Gabareyev testified that 30 minutes prior to departing for Glendale, he spoke with Mikayelyan who told Gabareyev that "[Bekaryn] will tell you more over there on the way [to Glendale], and when you guys get there you guys,[Bekaryn will] tell you guys what you got to do there."[9] Because the plan ultimately consisted of supplying members of the extortion team with guns, Mikayelyan's statement tends to show that Mikayelyan should reasonably have foreseen Bekaryn's plan to give guns to the Glendale extortion team to carry out the extortion attempt.[10]
 
 
 114
 We hold that the district court did not clearly err in enhancing Mikayelyan's sentence under S 2E2.1(b)(1)(C).
 
 B. U.S.S.G. S 3B1.1(b)
 
 115
 Section 3B1.1(b) provides: "If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels." Mikayelyan argues that the district court erred in finding that he was a "manager or supervisor" of the extortion attempt under U.S.S.G. S 3B1.1(b). We are not persuaded.
 
 
 116
 Mikayelyan admitted that he was the one initially contacted by Bekaryn to put together an extortion team. He subsequently recruited several of the people involved in the carstealing conspiracy to carry out the extortion attempt. He instructed them to drive to Glendale and meet Bekaryn for further instructions. Also probative was evidence that Mikayelyan was the leader of the overall car stealing conspiracy. See United States v. Scarano, 975 F.2d 580, 587 (9th Cir. 1992) (as amended) (considering all "relevant conduct" in determining whether to adjust the defendant's sentence under S 3B1.1(b)). This court has affirmed adjustments under S 3B1.1(b) under similar circumstances. See United States v. Arias-Villanueva, 998 F.2d 1491, 1514 (9th Cir. 1993) (no clear error where "evidence at trial showed that[the defendant] supervised a heroin network consisting of several persons, two of whom were charged in the same indictment"); United States v. Koenig, 952 F.2d 267, 273 (9th Cir. 1991) (no clear error where the defendant recruited one person and played managerial role in scheme; no clear error for codefendant where that defendant "took the lead " in allocating manpower and played a role in educating members of the scheme).
 
 
 117
 We hold that the district court's finding that Mikayelyan was a "manager or supervisor" under section 3B1.1(b) was not clearly erroneous, and that the district court did not err in applying a three-level adjustment to Mikayelyan's sentencing score.
 
 IX. 18 U.S.C. S 201(c)(2)
 
 118
 The defendants argue that the government violated the antigratuity statute, 18 U.S.C. S 201(c)(2), by offering immunity to two unindicted co-conspirators (Gabareyev and Bekaryn) in exchange for their truthful testimony against the defendants, and that the district court erred in not suppressing those witness's testimony. Because the defendants failed to object to the admission of their co-conspirators' testimony in the district court, we review this issue for plain error. See United States v. Olano, 507 U.S. 725, 731-32 (1993).
 
 
 119
 This court recently foreclosed this issue by holding that a district court does not commit plain error by failing to suppress testimony similarly obtained in alleged violation of section 201(c)(2). See United States v. Flores, 172 F.3d 695, 699-700 (9th Cir. 1999), petition for cert. filed, (U.S. June 28, 1999) (No. 99-5111). We hold that the district court did not plainly err under section 201(c)(2) in failing to suppress the testimony of the defendant's co-conspirators.
 
 CONCLUSION
 
 120
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 A "salvaged" car is typically one that has been involved in an accident, but which the insurance company has deemed too expensive to fix. These cars are usually sold at auctions for their parts.
 
 
 [2]
 The defendants rely heavily on the fact that Juror Yerkes was eventually excused because she stated that she thought the defendants were "gypsies," and that she did not allow "gypsies" in the restaurant where she worked because "they wreak havoc and whatnot. " The fact that a juror was later excused because of an alleged ethnic bias against "gypsies" does not, however, show that the district court's voir dire was inadequate, or that voir dire inquiry about "gypsies" was required. None of the defendants' proposed voir dire questions mentioned anything about "gypsies." Further, as the district court explained, "[f]actually there is nothing in the records that I have seen or heard that would [and ] . . . [t]here is nothing in evidence in this case that would lead [Yerkes ] to believe that the defendants were gypsies."
 
 
 [3]
 Immediately before Yerkes asked to speak with the judge about the threat, the judge had dismissed Juror Arthur Barnello for discussing the case with an FBI agent who attended Barnello's church.
 
 
 [4]
 Juror number 10 stated: "I didn't understand what she was saying. It didn't make a whole lot of sense to us, and she asked us if she was a gypsy. So it just didn't make any sense . . . ." Similarly, Juror number twelve stated: "Then she said something about -something sort of disjointed, something about gypsies, and asked if anyone knew anything about gypsies, which nobody really got the gist of, and that was it. That's about all I remember about the conversation."
 
 
 [5]
 In his brief, Semenov argues that once the jury is exposed to extraneous information, the government bears a heavy burden of showing that the contact with the juror was harmless to the defendant. See Remmer v. United States, 347 U.S. 227, 229 (1954). It is unclear whether Remmer applies, however, because that case involved an ex parte communication between a juror and an outside person, whereas this case involved an allegation that the jurors were exposed to the bias of one juror. In any event, even if Remmer applies, we conclude that the Government adequately demonstrated that the jury's exposure to Yerkes's conduct was harmless.
 
 
 [6]
 After the second and third jurors interviewed suggested that they thought the incidents might be connected, the judge disclaimed any connection in his introductory remarks to the remaining jurors.
 
 
 [7]
 Because the issue is not before us, we do not address whether Semenov can make his claim of insufficiency of the evidence on a subsequent appeal if he is convicted on retrial. But see United States v. Gulledge, 739 F.2d 582, 584 (11th Cir. 1984) ("Because the purported insufficiency of the evidence in the first trial is reviewable by this court only on appeal from a conviction after a second trial, we have no jurisdiction over appellant's [claim]." (citations omitted)). We do note, however, that United States v. James, 109 F.3d 597 (9th Cir. 1997), does not bar Semenov from raising this claim in the future. In James, the defendant was convicted on three of four counts of bank robbery. The jury deadlocked on the fourth count, and the district court declared a mistrial. On appeal, the defendant challenged his three convictions contending that the evidence was insufficient. The James court agreed, and reversed the defendant's three convictions. After the government sought to retry the defendant on the deadlocked count, the defendant appealed, arguing that the double jeopardy clause barred retrial. This court rejected that claim, and held that because the defendant failed to challenge the sufficiency of evidence underlying the deadlocked count in his first appeal challenging his convictions, he had waived that claim. See id. at 600. In this case, however, Semenov has not waived his sufficiency of the evidence claim because unlike the defendant in James, Semenov has raised the issue in his first appeal.
 
 
 [8]
 The following exchange took place:
 AUSA: Now, on cross-examination you've also been asked about this episode with Yuri and the burnt car, and Yuri's allega tion that Ruslan Gabareyev had a gun when he met with Yuri.
 Did you ever ask Ruslan about that?
 Doroshov: Yes.
 Q: And what did he tell you?
 A: That he didn't have a gun.
 
 
 [9]
 Mikayelyan argues that the testimony of Gabareyev was not reliable and should not have been credited by the district court. The district court's credibility determinations, however, are afforded great deference, and the district court did not clearly err in crediting his testimony. See United States v. Reed, 80 F.3d 1419, 1424 (9th Cir. 1996) (according great deference to district court's credibility determination). Further, much of Gabareyev's testimony about the extortion attempt was corroborated by Detective Doroshov's log, which kept track of Doroshov's meetings with Gabareyev. Doroshov's log was attached to his sworn declaration, which the district court found to be "presumptively reliable."
 
 
 [10]
 The government also argues that Mikayelyan's foreseeability on the use of guns is supported by the fact that Mikayelyan knew the exact location of one of the guns used in the extortion attempt after that crime was committed. This fact is not really probative, however, of whether it was foreseeable to Mikayelyan that guns would be used in the extortion attempt beforehand. Mikayelyan could reasonably have learned about the location of the gun only after that gun was used in the extortion attempt.